# IN THE SUPREME COURT OF CALIFORNIA

UNION OF MEDICAL MARIJUANA PATIENTS, INC.,
Plaintiff and Appellant,

v.

CITY OF SAN DIEGO,
Defendant and Respondent;
CALIFORNIA COASTAL COMMISSION,
Real Party in Interest.

S238563

Fourth Appellate District, Division One
D068185

San Diego County Superior Court
37-2014-00013481-CU-TT-CTL

August 19, 2019

Chief Justice Cantil-Sakauye authored the opinion of the Court, in which Justices Chin, Corrigan, Liu, Cuéllar, Kruger and Groban concurred.

UNION OF MEDICAL MARIJUANA PATIENTS, INC.,
v. CITY OF SAN DIEGO

S238563


Opinion of the Court by Cantil-Sakauye, C. J.


The California Environmental Quality Act, Public Resources Code sections 21000 et seq. (CEQA), applies to "projects," a term defined by statute. In general, a project is an activity that (1) is undertaken or funded by, or subject to the approval of a public agency and (2) may cause "either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." (Pub. Res. Code, § 21065.)[1] Although section 21065 supplies the definition of a project, another provision of CEQA, section 21080, subdivision (a), can be interpreted to declare specified public agency activities, including the amendment of a zoning ordinance, to be a project as a matter of law, without regard to their potential for causing a physical change in the environment. In this matter, we must decide whether to adopt this interpretation of section 21080, which would prevail over section 21065 with respect to the specific public agency activities listed in section 21080.

In 2014, the City of San Diego (City) adopted an ordinance authorizing the establishment of medical marijuana

_____

[1] Unless indicated otherwise, all further statutory references are to the Public Resources Code.

1

dispensaries and regulating their location and operation. The central provisions of this ordinance amended various City zoning regulations to specify where the newly established dispensaries may be located. Because the City found that adoption of the ordinance did not constitute a project for purposes of CEQA, it did not conduct any environmental review. Petitioner Union of Medical Marijuana Patients (UMMP) challenged the City's failure to conduct CEQA review in a petition for writ of mandate, which was denied by the trial court.

On appeal, UMMP argued (1) the amendment of a zoning ordinance, one of the public agency activities listed in section 21080, is conclusively declared a project by that statute and (2) the City's ordinance, in any event, satisfied the definition of a project under section 21065. The former argument was premised in part on *Rominger v. County of Colusa* (2014) 229 Cal.App.4th 690 (*Rominger*), which relied on section 21080 in concluding that a county's approval of a tentative subdivision map, another activity listed in section 21080, was a project as a matter of law. Here, the Court of Appeal disagreed with *Rominger*, concluding that the amendment of a zoning ordinance is subject to the same statutory test as public agency activities not listed in section 21080. The court proceeded to find no error in the City's conclusion that the ordinance was not a project because it did not have the potential to cause a physical change in the environment. We granted review to resolve the conflict between the two Courts of Appeal regarding the interpretation of section 21080.

We agree with the Court of Appeal below that section 21080 does not override the definition of project found in

section 21065. Accordingly, the various activities listed in section 21080 must satisfy the requirements of section 21065 before they are found to be a project for purposes of CEQA. On the other hand, we conclude that the Court of Appeal misapplied the test for determining whether a proposed activity has the potential to cause environmental change under section 21065, which was established in *Muzzy Ranch Co. v. Solano County Airport Land Use Commission* (2007) 41 Cal.4th 372 (*Muzzy Ranch*), and erred in affirming the City's finding that adoption of the ordinance did not constitute a project. For that reason, we reverse and remand for further proceedings.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  The City's Medical Marijuana Ordinance

Health and Safety Code section 11362.83, a provision of the Medical Marijuana Program (Health & Saf. Code, § 11362.7 et seq.), recognizes the authority of local governments to adopt ordinances regulating the "location, operation, or establishment of a medicinal cannabis cooperative or collective." (Health & Saf. Code, § 11362.83, subd. (a); see *Kirby v. County of Fresno* (2015) 242 Cal.App.4th 940, 956.) In 2014, the City enacted such a regulation, San Diego Ordinance No. O-20356 (Ordinance). The Ordinance amended a variety of City Municipal Code sections to authorize the establishment, and regulate the siting and operation of, "medical marijuana consumer cooperatives" (dispensaries), which were defined as "a facility where marijuana is transferred to qualified patients or primary caregivers in accordance with the Compassionate Use Act of 1996 and the Medical Marijuana Program Act." (Ord., § 1.)

The primary provisions of the Ordinance amended several of the City's zoning regulations to cap the number of dispensaries and specify where in the City they could be located. Dispensaries were added to the list of permitted uses in two of the City's six categories of commercial zones and two of the four categories of industrial zones (Ord., §§ 6, 7, 13, 15), and they were expressly excluded from open space, agricultural, and residential zones. (*Id.*, §§ 3, 4, 5.) Dispensaries were also added to the list of permitted uses in certain planned districts of the City. (*Id.*, §§ 10, 11, 13.) The Ordinance placed an upper limit of four dispensaries in any single city council district and required a dispensary to be located more than 1,000 feet from certain sensitive uses, such as parks and schools, and more than 100 feet from a residential zone. (*Id.*, § 8.) Regardless of location, the Ordinance required the grant of a conditional use permit for a dispensary's operation. (*Id.*, §§ 2, 6, 7, 8.)

In addition to defining the location of dispensaries, the Ordinance imposed basic conditions on their operation, such as prohibiting the provision of medical consultation services, requiring particular lighting and security, defining permissible signage, and limiting hours of operation. (Ord., § 8.)

Because the City contains nine city council districts, the Ordinance's limit of four dispensaries per district permitted, in theory, the establishment of 36 dispensaries. A study commissioned by the City, however, found that the other restrictions placed on the location of dispensaries by the Ordinance, such as the limitation to particular zoning districts and the minimum distance from sensitive uses, precluded the establishment of a dispensary entirely in one city council

district and limited two other districts to three dispensaries each. This left a practical maximum of 30 dispensaries. City planning staff concluded that the actual number of dispensaries to be created "is very likely to be significantly less," since "factors such as available units for rent, rental rates, overall demand for dispensaries, and proximity of potential sites to target markets would rule out some sites."

Because the City found CEQA inapplicable to the Ordinance's enactment, it conducted no environmental review prior to its adoption. The City's finding explained its reasoning: "The . . . Ordinance is not subject to [CEQA] . . . , in that it is not a Project . . . . Adoption of the ordinance does not have the potential for resulting in either a direct physical change in the environment, or reasonably for[e]seeable indirect physical change in the environment. Future projects subject to the ordinance will require a discretionary permit and CEQA review, and will be analyzed at the appropriate time in accordance with CEQA."

## B. This Litigation

According to its President, UMMP is "a civil rights organization that is devoted to defending and asserting the rights of medical cannabis patients as well as promoting safe access to medical marijuana." Prior to adoption of the Ordinance, UMMP submitted two letters to the City Council objecting to the failure to conduct environmental review under CEQA. The letters argued that the Ordinance should have been found to be a project for purposes of CEQA because it had the potential to cause either a direct physical change in the environment or a reasonably foreseeable indirect physical change. (§ 21065.) According to UMMP, adoption of the

Ordinance could affect the environment because (1) restrictions on the siting of dispensaries would require "thousands of patients to drive across the City" to obtain medical marijuana; (2) the City might prosecute and close existing, unpermitted marijuana dispensaries, causing medical marijuana users to engage in the "inherently agricultural practice" of growing their own marijuana; and (3) "the unique development impacts associated with [dispensaries] [would be] shifted to certain areas of the City and intensified due to the limit on the total number of [dispensaries]."

After the City disregarded UMMP's arguments and adopted the Ordinance without further environmental review, UMMP filed a petition for writ of mandate challenging the adoption of the Ordinance under CEQA. The trial court, in an extensive written minute order, rejected UMMP's claims of the Ordinance's potential for causing environmental change, concluding there was insufficient evidence in the record to support those claims.

On appeal, UMMP repeated its argument that the Ordinance should have been considered a project as a result of its potential for physical change in the environment, but it raised the additional argument that the Ordinance should be deemed a project as a matter of law under section 21080, which states that CEQA "shall apply to discretionary projects proposed to be carried out or approved by public agencies, including, but not limited to, the enactment and amendment of zoning ordinances . . . ." (§ 21080, subd. (a).) In effect, UMMP argued, section 21080 classifies every zoning amendment as a project under CEQA, regardless of its potential for effecting environmental change. In a published opinion that will be

discussed in more detail *post*, the Court of Appeal rejected both arguments. (*Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2016) 4 Cal.App.5th 103, 116, 119-124 (*Marijuana Patients*).) In doing so, the court expressly disagreed with the holding of *Rominger*, *supra*, 229 Cal.App.4th 690, that section 21080 declares the specified public agency activities to be CEQA projects as a matter of law. (*Rominger*, at pp. 702-703; *Marijuana Patients*, at p. 118.)

## II.  DISCUSSION

### A.  Governing Law

#### 1.  Statutory interpretation

Statutory interpretation is "an issue of law, which we review de novo." (*United Riggers & Erectors, Inc. v. Coast Iron & Steel Co.* (2018) 4 Cal.5th 1082, 1089.)

Our overriding purpose in construing a provision of CEQA, as with any statute, is "to adopt the construction that best gives effect to the Legislature's intended purpose." (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 381 (*Building Industry*).) In determining that intended purpose, we follow "[s]ettled principles." (*Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, 609 (*Elk Hills*).) "We consider first the words of a statute, as the most reliable indicator of legislative intent." (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1037 (*Tuolumne Jobs*).) In doing so, we give the words "their usual and ordinary meaning," viewed in the context of the statute as a whole. (*Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 529.) As part of this process, " ' "[every]

statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect." ' " (*Elk Hills*, at p. 610.)

When the language of a statute is ambiguous — that is, when the words of the statute are susceptible to more than one reasonable meaning, given their usual and ordinary meaning and considered in the context of the statute as a whole — we consult other indicia of the Legislature's intent, including such extrinsic aids as legislative history and public policy. (*Ceja v. Rudolph & Sletten, Inc.* (2013) 56 Cal.4th 1113, 1119; *Elk Hills*, *supra*, 57 Cal.4th at pp. 609-610.) If there is no ambiguity, " ' " 'we presume the Legislature meant what it said and the plain meaning of the statute governs.' " ' " (*Ceja*, at p. 1119.)

In construing provisions of CEQA, two unique considerations apply. First, CEQA is implemented by an extensive series of administrative regulations promulgated by the Secretary of the Natural Resources Agency, ordinarily referred to as the "CEQA Guidelines."[2] (Guidelines, § 15000.) Through long practice, we "afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2; see *Building Industry*, *supra*, 62 Cal.4th at p. 381.) Second, from CEQA's inception we have held that "the

---

[2] We will cite and refer to CEQA's implementing regulations, codified at title 14, division 6, chapter 3 of the California Code of Regulations, as the "Guidelines."

Legislature intended . . . [C]EQA to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 259; see *Building Industry*, at p. 381.)

### 2. *CEQA generally*

"CEQA was enacted to advance four related purposes:  to (1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, environmental damage; (3) prevent environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and (4) disclose to the public the rationale for governmental approval of a project that may significantly impact the environment." (*Building Industry*, *supra*, 62 Cal.4th at p. 382.) "CEQA embodies a central state policy to require state and local governmental entities to perform their duties 'so that major consideration is given to preventing environmental damage.' [Citations.] [¶]  CEQA prescribes how governmental decisions will be made when public entities, including the state itself, are charged with approving, funding — or themselves undertaking — a project with significant effects on the environment." (*Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677, 711-712, italics omitted (*Eel River*).)

"CEQA review is undertaken by a lead agency, defined as 'the public  agency which  has  the  principal  responsibility for carrying out or approving a project which may have a significant effect upon the environment.' " (*Eel River*, *supra*, 3 Cal.5th  at  p.  712,  quoting  §  21067,  italics  omitted.)

A putative lead agency's implementation of CEQA proceeds by way of a multistep decision tree, which has been characterized as having three tiers. (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 380.) First, the agency must determine whether the proposed activity is subject to CEQA at all. Second, assuming CEQA is found to apply, the agency must decide whether the activity qualifies for one of the many exemptions that excuse otherwise covered activities from CEQA's environmental review. Finally, assuming no applicable exemption, the agency must undertake environmental review of the activity, the third tier.[3] (*Muzzy Ranch*, at pp. 380-381.) We examine the three-tier process in more detail below.

*CEQA's applicability*: When a public agency is asked to grant regulatory approval of a private activity or proposes to fund or undertake an activity on its own, the agency must first decide whether the proposed activity is subject to CEQA. (Guidelines, § 15060, subd. (c).) In practice, this requires the agency to conduct a preliminary review to determine whether the proposed activity constitutes a "project" for purposes of CEQA. (*Tuolumne Jobs*, *supra*, 59 Cal.4th at p. 1037; see § 21065; Guidelines, § 15378, subd. (a) [both defining

---

[3] In a very early CEQA case, *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, we described the three tiers differently, disregarding the project step and dividing the third tier into two parts, the preparation of an initial study and, if required, an environmental impact report (EIR). (*Id.* at p. 74.) Because the initial study and EIR are both aspects of environmental review, we find the *Muzzy Ranch* characterization more helpful in understanding CEQA's procedures.

"project"].)  If the proposed activity is found not to be a project, the agency may proceed without further regard to CEQA.[4] (*Muzzy Ranch, supra*, 41 Cal.4th at p. 380; Guidelines, § 15060, subd. (c)(3) [if a proposed activity does not qualify as a project, it "is not subject to CEQA"].)

*Exemption from environmental review*:  If the lead agency concludes it is faced with a project, it must then decide "whether the project is exempt from the CEQA review process under either a statutory exemption [citation] or a categorical exemption set forth in the CEQA Guidelines."  (*Building Industry, supra*, 62 Cal.4th at p. 382.)  The statutory exemptions, created by the Legislature, are found in section 21080, subdivision (b).  Among the most important exemptions is the first, for "[m]inisterial" projects, which are defined generally as projects whose approval does not require an agency to exercise discretion.  (§ 21080, subd. (b)(1); Guidelines, § 15369; see *Sierra Club v. County of Sonoma* (2017) 11 Cal.App.5th 11, 19-20 (*Sierra Club*).)  The categorical exemptions, found in Guidelines sections 15300 through 15333, were promulgated by the Secretary for Natural Resources in response to the Legislature's directive to develop "a list of

---

[4]    Courts have often labeled the project decision "jurisdictional" because it determines whether CEQA applies at all. (*Muzzy Ranch, supra*, 41 Cal.4th at p. 380; *Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 112.) The term is inapposite because an agency's jurisdiction over a proposed activity does not depend upon the application of CEQA.  Nonetheless, its use conveys the preliminary nature of the project determination.

classes of projects which have been determined not to have a significant effect on the environment." (§ 21084, subd. (a); Guidelines, § 15354; see generally, *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1100-1101 (*Berkeley Hillside*).) If the lead agency concludes a project is exempt from review, it must issue a notice of exemption citing the evidence on which it relied in reaching that conclusion. (*Muzzy Ranch, supra,* 41 Cal.4th at pp. 380, 386-387.) The agency may thereafter proceed without further consideration of CEQA.

*Environmental review*: Environmental review is required under CEQA only if a public agency concludes that a proposed activity is a project and does not qualify for an exemption. In that case, the agency must first undertake an initial study to determine whether the project "may have a significant effect on the environment." (Guidelines, § 15063, subd. (a); *Friends of the College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 945 (*San Mateo Gardens*).) If the initial study finds no substantial evidence that the project may have a significant environmental effect, the lead agency must prepare a negative declaration, and environmental review ends. (§ 21080, subd. (c)(1); *San Mateo Gardens*, at p. 945.) If the initial study identifies potentially significant environmental effects but (1) those effects can be fully mitigated by changes in the project and (2) the project applicant agrees to incorporate those changes, the agency must prepare a *mitigated* negative declaration. This too ends CEQA review. (§ 21080, subd. (c)(2); *San Mateo Gardens*, at p. 945.) Finally, if the initial study finds substantial evidence that the project may have a significant environmental impact and a

mitigated negative declaration is inappropriate, the lead agency must prepare and certify an environmental impact report before approving or proceeding with the project. (§ 21080, subd. (d); *Building Industry*, *supra*, 62 Cal.4th at p. 382.)

### 3. *The Court of Appeal's decision*

At issue before the Court of Appeal was the first tier in the CEQA process, the determination by a putative lead agency whether a proposed activity constitutes a project. In particular, the court was asked to decide whether a public agency's amendment of a zoning ordinance constitutes a project as a matter of law.

As suggested *ante*, two separate provisions of the Public Resources Code are potentially relevant to this question. "Project" is defined in section 21065 as an activity (1) undertaken or funded by or requiring the approval of a public agency that (2) "may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment."[5] (See *Sunset*

---

[5] The full text of section 21065 follows:

" 'Project' means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following:

"(a) An activity directly undertaken by any public agency.

"(b) An activity undertaken by a person which is supported, in whole or in part, through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies.

*Sky Ranch Pilots Assn. v. County of Sacramento* (2009) 47 Cal.4th 902, 907 (*Sky Ranch Pilots*).) The controversy arises because a related statute, section 21080, can be interpreted to override section 21065 with respect to the classification of zoning ordinance amendments and certain other public agency activities: "Except as otherwise provided in this division, this division shall apply to discretionary *projects* proposed to be carried out or approved by public agencies, *including, but not limited to, the enactment and amendment of zoning ordinances,* the issuance of zoning variances, the issuance of conditional use permits, and the approval of tentative subdivision maps unless the project is exempt from this division." (§ 21080, subd. (a), italics added.) As UMMP argued, this language can be read to classify the various listed agency activities as "discretionary projects" in every case, regardless of their potential for bringing about a physical change in the environment.

The Court of Appeal rejected UMMP's argument that "*any* enactment of a zoning ordinance by a public agency *necessarily* constitutes a project." (*Marijuana Patients, supra,* 4 Cal.App.5th at p. 114.) The court began its analysis by concluding that section 21080's listing of various local agency activities is ambiguous. As the court viewed it, the Legislature could have intended either "that the examples given . . . are illustrations of activities that are 'discretionary projects

---

"(c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."

proposed to be carried out or approved by public agencies,' *or* . . . are illustrations of activities 'proposed to be carried out or approved by public agencies,' but that not all such activities will qualify as 'discretionary projects.' " (*Marijuana Patients*, at p. 115.) The court rejected the first reading on the basis of section 21065. It noted that section 21065 defines a project as having two characteristics, the potential to cause a physical change in the environment and the involvement of a public agency. To harmonize the "more specific provision" of section 21065 with the "more general provision" of section 21080, the court held that the "most reasonable interpretation" of section 21080, subdivision (a), is that the various listed public agency activities are examples of " '[a]n activity directly undertaken by any public agency' as set forth in section 21065, but that the enactment or amendment of a zoning ordinance will not constitute a CEQA project unless it *also* meets the second requirement in section 21065, namely that it 'may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment.' " (*Marijuana Patients*, at p. 116.)

The court found support for its interpretation in Guidelines section 15378. (*Marijuana Patients*, *supra*, 4 Cal.App.5th at p. 116.) As noted above, the Guidelines are "afford[ed] great weight" in interpreting CEQA. (*Building Industry*, *supra*, 62 Cal.4th at p. 381.) In defining "project," Guidelines section 15378, subdivision (a)(1) partially melds sections 21065 and 21080: " 'Project' means the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and

that is any of the following:   [¶]   (1) An activity directly undertaken by any public agency including but not limited to public works construction and related activities[,] clearing or grading of land, improvements to existing public structures, enactment and amendment of zoning ordinances, and the adoption and amendment of local General Plans or elements thereof . . . ."[6]   Although Guidelines section 15378 includes an express reference to the enactment or amendment of a zoning ordinance, it classifies those activities merely as examples of "activit[ies] directly undertaken by any public agency." (*Id.*, subd. (a)(1).)   The requirement that an activity have the potential to cause a change in the environment is classified by

---

[6]   The complete text of Guidelines section 15378, subdivision (a), is as follows:

" 'Project' means the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and that is any of the following:

"(1) An activity directly undertaken by any public agency including but not limited to public works construction and related activities[,] clearing or grading of land, improvements to existing public structures, enactment and amendment of zoning ordinances, and the adoption and amendment of local General Plans or elements thereof pursuant to Government Code Sections 65100-65700.

"(2) An activity undertaken by a person which is supported in whole or in part through public agency contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies.

"(3) An activity involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."

Guidelines section 15378 as an independent element of "project," applicable whether or not the activity is listed in section 21080. "Thus," the Court of Appeal concluded, "under the CEQA Guidelines, the enactment and amendment of a zoning ordinance is a project *only if* that action *also* creates 'a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment.' " (*Marijuana Patients*, *supra*, at p. 116.)

The Court of Appeal rejected the contrary conclusion of *Rominger*, *supra*, 229 Cal.App.4th 690, because that court's "analysis ignores the definition of a project as set forth in CEQA and the CEQA Guidelines." (*Marijuana Patients*, *supra*, 4 Cal.App.5th at p. 118.) *Rominger*, in holding that a county's approval of a tentative subdivision map constituted a project as a matter of law under section 21080, did not base its ruling on an analysis of the respective texts of sections 21065 and 21080. Rather, it looked to our observation in *Muzzy Ranch*, *supra*, 41 Cal.4th 372, that "[w]hether an activity constitutes a project subject to CEQA is a categorical question respecting whether the activity is of a general kind with which CEQA is concerned, without regard to whether the activity will actually have environmental impact." (*Id*. at p. 381.) Taking this principle as its guide, *Rominger* concluded that "the Legislature has determined [in section 21080, subdivision (a)] that certain activities, including the approval of tentative subdivision maps, *always* have at least the *potential* to cause a direct physical change or a reasonably foreseeable indirect physical change in the environment." (*Rominger*, at p. 702.) In reaching this conclusion, *Rominger* did not, as *Marijuana*

17

*Patients* rightly noted, take into account the language of section 21065 or otherwise attempt to reconcile the two statutes.

Having held that the Ordinance was not a project unless it had the potential to cause a direct or reasonably foreseeable indirect physical change in the environment, as required by section 21065, the Court of Appeal proceeded to consider UMMP's argument that the City erred in concluding that the Ordinance did not have that potential. (*Marijuana Patients*, *supra*, 4 Cal.App.5th at p. 119.) UMMP effectively conceded that the Ordinance did not have the potential to cause a direct physical change (*Marijuana Patients*, at p. 113), but it contended, as noted above, that the Ordinance had the potential to cause various indirect effects, namely, increased traffic from patients driving to the new dispensaries, increased self-cultivation of marijuana, and changed patterns of urban development within the City. (*Marijuana Patients*, at p. 120.) After evaluating each of the claimed indirect effects individually, the court concluded that all were too speculative or lacking in evidentiary support in the administrative record to permit a finding that they were reasonably foreseeable, as required by section 21065. (*Marijuana Patients*, at pp. 120-124.) Finding no error in the City's determination that CEQA was inapplicable, the Court of Appeal affirmed the trial court's denial of a writ of mandate. (*Marijuana Patients*, at p. 124.)

### B. Whether Section 21080 Conclusively Declares the Amendment of a Zoning Ordinance To Be a CEQA "Project"

We agree with the Court of Appeal that section 21080 does not dictate the result here as a matter of law, and we agree for essentially the reasons cited by that court.[7]

As the Court of Appeal concluded, section 21080's statement that CEQA applies to "discretionary projects proposed to be carried out or approved by public agencies," followed by its listing of the amendment of a zoning ordinance as an example, is ambiguous, at least when considered in isolation. It is unclear from the text of section 21080 whether the amendment of a zoning ordinance, as well as the other listed activities, are examples of "discretionary projects" to

---

[7] The City urges us to dismiss this appeal as moot on the basis of Business and Professions Code section 26055, subdivision (h), enacted after we granted review (Stats. 2017, ch. 27, § 41), which exempts from CEQA a public agency's enactment of any regulation that requires discretionary review of licenses to engage in "commercial cannabis activity." The City does not argue that subdivision (h) applies retroactively to exempt the Ordinance from CEQA, and we offer no opinion on that issue. Instead, the City contends that UMMP can no longer be granted effective relief because the City could re-enact the Ordinance without environmental review. (See *In re David B.* (2017) 12 Cal.App.5th 633, 644 [a matter becomes moot if effective relief can no longer be granted].) We reject the argument because the trial court can still grant some of the relief requested by UMMP by vacating the City's approval of the Ordinance, if such relief is appropriate. (See *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 127 [matter not moot because petitioner "can still be awarded the relief it seeks, an order that [the] [c]ity set aside its approvals"].)

which CEQA *does* apply, or whether they are examples of discretionary activities "proposed to be carried out or approved by public agencies" to which CEQA *might* apply.

When interpreting the provisions of CEQA, however, we do not consider them in isolation, but in the context of the entire statute. (*Tuolumne Jobs*, *supra*, 59 Cal.4th 1029, 1037.) Within CEQA, "project" is not merely a word; it is a defined term. " 'If the Legislature has provided an express definition of a term, that definition ordinarily is binding on the courts.' " (*State ex rel. Dept. of California Highway Patrol v. Superior Court* (2015) 60 Cal.4th 1002, 1011.) As a corollary of this principle, "[t]erms defined by the statute in which they are found will be presumed to have been used in the sense of the definition." (*Faulder v. Mendocino County Bd. of Supervisors* (2006) 144 Cal.App.4th 1362, 1371.) In the case of CEQA, this judicial presumption is legislatively mandated. Section 21060 expressly states that CEQA's definitions "govern the construction of this division."

Applying this principle of interpretation, we must assume that in using the defined term "project" in section 21080, the Legislature intended it to bear the definition assigned in section 21065. Accordingly, the first portion of section 21080, subdivision (a) — "Except as otherwise provided in this division, this division shall apply to discretionary projects proposed to be carried out or approved by public agencies" — must be understood to mean that CEQA applies to activities proposed to be carried out or approved by a public agency that both (1) are discretionary and (2) satisfy the requirements for a project under section 21065. Although all of the exemplary activities listed in section 21080 necessarily

satisfy section 21065's requirement of public agency involvement, there is no reason to conclude that they invariably satisfy its requirement of the potential to cause a physical change in the environment. For that reason, we must interpret the listing of public agency activities in section 21080, subdivision (a), merely to offer generic examples of the type of "discretionary [activities] proposed to be carried out or approved by public agencies" to which CEQA *could* apply. CEQA *does* apply only to activities that qualify as projects — in other words, to specific examples of the listed activities that have the potential to cause, directly or indirectly, a physical change in the environment.

UMMP has not suggested any reason why the ordinary presumption requiring a defined term to carry that meaning should not apply in these circumstances, and we aware of none. As noted, the definition in section 21065 is legislatively mandated to apply to section 21080, as well as to the remainder of CEQA. (§ 21060.) Nothing in section 21080 suggests that the Legislature intended to exempt the listed activities from satisfying the requirements for a project. On the contrary, its use of the defined term "project," rather than a generic term such as "activity," suggests that the Legislature intended to incorporate the defined concept. Finally, using the defined meaning does not result in an absurdity or otherwise impair the enforcement of CEQA. It simply confirms that the public agency activities listed in section 21080 must satisfy the same requirement applicable to nonlisted activities before they are subject to CEQA, the requirement of potential for physical change in the environment. (See § 21065.)

Because the plain language of section 21080 is unambiguous when evaluated in context, it is unnecessary for us to consider other indicia of meaning. Yet it is worth noting that other available indicia support our interpretation. First and most important, as the Court of Appeal recognized, our interpretation is consistent with that of the Secretary for Natural Resources in the Guidelines, to which we must "afford great weight." (*Building Industry*, *supra*, 62 Cal.4th at p. 381.) In defining "project," the Guidelines impose the requirement of a potential for causing a physical change in the environment on all public agency activities. (Guidelines, § 15378, subd. (a).) Although Guidelines section 15378 mentions enactment and amendment of a zoning ordinance, activities also mentioned in section 21080, it cites those activities merely as examples of activities "directly undertaken by any public agency" (§ 15378, subd. (a)(1)), a usage equivalent to our understanding of the significance of the list of activities in section 21080. Guidelines section 15378 does not suggest that the enactment or amendment of a zoning ordinance constitutes a project without regard to its potential for causing environmental change.

Policy considerations favor this interpretation as well. Finding a proposed activity subject to CEQA can lead to additional costs, in time and money, for both a public agency and a private applicant. (*Sky Ranch Pilots*, *supra*, 47 Cal.4th 902, 909.) As section 21065 recognizes, there is no reason to impose those costs by subjecting a proposed activity to CEQA if the activity does not have the potential to affect the environment. Declaring all of the activities listed in section 21080 to be a project would necessarily subject them to these

incremental costs without regard to their potential for causing an environmental impact.

The legislative history of sections 21065 and 21080 also supports our conclusion. As originally enacted, section 21065 defined "project" merely as an activity undertaken, financed or subject to approval by a government agency, using the text now contained in subdivisions (a) through (c) of the statute. (Stats. 1972, ch. 1154, § 1, pp. 2271-2272.) The statute did not contain the further requirement that a proposed activity have the potential to cause environmental change. At that time, section 21080, subdivision (a) was materially identical to its present text. (Stats. 1972, ch. 1154, § 1, p. 2272.) Accordingly, the local government activities listed in section 21080 necessarily constituted examples of "projects," since all land use regulations and approvals constituted projects under the version of section 21065 in effect at the time.[8] In 1994, section 21065 was amended to its present form, limiting "projects" to governmental activities that posed the possibility of an environmental effect. (Stats. 1994, ch. 1230, § 4, p. 7682.) The purpose of the amendment was to "prohibit CEQA from being used to delay or kill [activities] that have no direct or indirect effect on the environment" by narrowing the definition of project. (Assem. Natural Resources Com., Republican Analysis of Sen. Bill No. 749 (1993-1994 Reg. Sess.) Aug. 22, 1994, p. 1.)

---

[8] The significance of the list in section 21080 was presumably to classify the activities as "discretionary" projects, which made them ineligible for the ministerial exemption under section 21080, subdivision (b).

To continue to treat all of the activities listed in section 21080 as "projects" following this amendment of section 21065, regardless of their potential for producing an environmental change, would entirely defeat the narrowing purpose of the amendment, at least as far as the listed activities are concerned.

The *Rominger* court, in holding that section 21080 declared all tentative subdivision map approvals to be projects, explained its reasoning in part by noting, "Presumably no one goes to the trouble of subdividing property just for the sake of the process; the goal of subdividing property is to make that property more useable. And with the potential for greater or different use comes the potential for environmental impacts from that use." (*Rominger*, *supra*, 229 Cal.App.4th at p. 702.) Even assuming this to be true with respect to tentative subdivision maps, the rationale supports *Rominger*'s statutory interpretation only if the same logic also holds for the other public agency activities listed in section 21080. It does not. As amici curiae League of California Cities and California State Association of Counties point out, many types of local government regulations are labeled "zoning ordinances," covering a wide range of regulatory subjects. Whether the enactment or amendment of a regulation denominated a "zoning ordinance" carries the potential for environmental change depends entirely on the nature of the particular regulation. A potential environmental effect cannot be presumed solely from the label applied to it. The same point applies with equal force to the two other activities listed in section 21080, zoning variances and conditional use permits. Neither can reliably be presumed to have the potential to

create environmental change. To subject such activities to CEQA as a matter of course serves no obvious public policy purpose.

It might be objected that this interpretation of section 21080, subdivision (a), strips the provision of its legal significance, rendering it surplusage (e.g., *Berkeley Hillside*, *supra*, 60 Cal.4th 1086, 1097 [we should avoid "interpretations that render any language surplusage"]), but that argument misunderstands the significance of section 21080 within CEQA. Section 21080, subdivision (a) establishes that CEQA applies to activities proposed to be carried out or approved by a public agency that are (1) discretionary and (2) satisfy the requirements for a project. This limitation to activities requiring the exercise of agency discretion is not otherwise reflected in CEQA, at least as stated in the affirmative. The only other statutory reference occurs by negative inference from the exemption for ministerial activities, which are defined as activities *not* requiring an agency's exercise of discretion. (*Sierra Club*, *supra*, 11 Cal.App.5th at pp. 19-20.) Not by coincidence, this exemption is contained in subdivision (b)(1) of section 21080, the subdivision immediately following the statute's reference to "discretionary projects."[9] Because it establishes the requirement of discretionary agency action, section 21080, subdivision (a) retains a legal significance

---

[9] As originally enacted, section 21080 consisted of the present text of subdivision (a) and a single exemption, the ministerial exemption, which was codified as subdivision (b). (Stats. 1972, ch. 1154, § 1, p. 2272.)

independent of its purported classification of the agency activities it specifies.

UMMP relies on *Rominger*, *supra*, 229 Cal.App.4th 690, in arguing that our decision in *Muzzy Ranch*, *supra*, 41 Cal.4th 372, dictates the conclusion that section 21080 declares the listed public agency activities to be a project as a matter of law. Again, we do not agree. *Muzzy Ranch* did not address, or even purport to consider, the question before us. Because the activity of concern in *Muzzy Ranch* was a local agency's approval of a land use compatibility plan (*Muzzy Ranch*, at p. 378), an activity not mentioned in section 21080, we had no reason to construe that statute, and the decision mentions section 21080 only once, in a general discussion of statutory exemptions. (*Muzzy Ranch*, at p. 380.) *Muzzy Ranch* is in no way binding in the present circumstances.[10]

We recognize that the *Muzzy Ranch* observation cited by *Rominger*, "[w]hether an activity constitutes a project subject to CEQA is a *categorical question* respecting whether the activity is of a *general kind* with which CEQA is concerned," may be interpreted to suggest that certain types of activities can be considered projects as a matter of law. (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 381, italics added.) Yet the decision does not so state. Other than its particular choice of phrase,

---

[10] For reasons stated in the text, we disapprove *Rominger v. County of Colusa*, *supra*, 229 Cal.App.4th 690, to the extent it holds that the various public agency activities listed in section 21080, subdivision (a), are conclusively declared to be CEQA projects.

there is no indication in *Muzzy Ranch* that the description of the project decision as a "categorical question" was intended to imply that entire categories of local governmental activities may be deemed projects, without consideration of their individual substance. Instead, as discussed further below, that characterization was intended to convey the relatively abstract and preliminary nature of the project decision.

### C. Whether the Ordinance Is the Sort of Activity That May Cause a Direct or Indirect Physical Change in the Environment

Because we conclude that section 21080 does not declare every zoning amendment to be a CEQA project as a matter of law, we must, like the Court of Appeal, review the City's conclusion that the Ordinance did not qualify as a project under section 21065. On this issue, we part ways with the Court of Appeal.

The governing decision is *Muzzy Ranch*, *supra*, 41 Cal.4th 372. The lead agency in *Muzzy Ranch* was a Solano County commission (commission) established to regulate land uses associated with county airports. (*Id.* at p. 378.) The activity of concern was the commission's adoption of the Travis Air Force Base land use compatibility plan (TALUP), which set out model land use policies for portions of the county neighboring the military air base. The policies were designed " 'to ensure that future land uses in the surrounding area will be compatible with the realistically foreseeable, ultimate potential aircraft activity at the base.' " (*Ibid.*) The *Muzzy Ranch* plaintiff was particularly concerned with the TALUP's model policy for a 600-square-mile area exposed to low altitude overflights by aircraft using the base. The policy, which did

not apply to developed areas within existing city limits, "purport[ed] to restrict residential development within [areas subject to overflights] to levels currently permitted under existing general plans and zoning regulations.  Specifically, the TALUP state[d] that '[n]o amendment of a general plan land use policy or land use map designation and no change of zoning shall be permitted if such amendment or change would allow more dwelling units in the affected area than are allowed under current zoning.'" (*Muzzy Ranch*, at p. 379.)

In approving the TALUP, the commission initially adopted a resolution finding that the approval was not a project under CEQA because the TALUP would not cause a direct or reasonably foreseeable indirect physical change in the environment.  (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 378.) Five days later, the commission also adopted a CEQA notice of exemption, finding that the TALUP's adoption "created '[n]o possibility of significant effect on the environment.' " (*Id.* at p. 379.)   *Muzzy Ranch* reviewed both the commission's conclusion that TALUP's approval was not a project and its finding that, if a project, the approval was exempt from environmental review.

As noted above, we began our discussion of the TALUP's status as a project by observing, "Whether an activity constitutes a project subject to CEQA is a categorical question respecting whether the activity is of a general kind with which CEQA is concerned, without regard to whether the activity will actually have environmental impact." (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 381.)   Because there was no question the commission's approval satisfied section 21065's requirement of public agency involvement, we addressed only "whether the

Commission's adoption of the TALUP is the sort of activity that may cause a direct physical change or a reasonably foreseeable indirect physical change in the environment." (*Muzzy Ranch*, at p. 382.)

On this issue, the plaintiff contended that the TALUP's limitation of development in the relevant area to existing approved levels could cause intensified development in other parts of the county, a phenomenon referred to as "displaced development." (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 382.) The commission responded that such effects were "inherently too speculative to be considered a reasonably foreseeable effect of an airport land use compatibility plan." (*Ibid*.) We began our analysis by recognizing that "no California locality is immune from the legal and practical necessity to expand housing due to increasing population pressures." (*Id*. at p. 383.) Given this expectation of growth, we reasoned that a local agency "may reasonably anticipate that its placing a ban on development in one area of a jurisdiction may have the consequence, notwithstanding existing zoning or land use planning, of displacing development to other areas of the jurisdiction." (*Ibid*.) On that reasoning alone, we held that the TALUP's approval might cause a reasonably foreseeable indirect physical change in the environment and therefore constituted a project. (*Ibid*.)

Our analysis of the commission's notice of exemption was quite different. In finding the TALUP exempt from environmental review, the commission relied on the "commonsense" exemption of the Guidelines, which applies "[w]here it can be seen with certainty that there is no possibility that the activity in question may have a significant

effect on the environment." (Guidelines, § 15061, subd. (b)(3).)
In contrast to the decision under section 21065, which we
treated as an issue of law, *Muzzy Ranch* held that the TALUP's
eligibility for the commonsense exemption "presents an issue of
fact, and . . . the agency invoking the exemption has the
burden of demonstrating it applies." (*Muzzy Ranch*, *supra*,
41 Cal.4th at p. 386.) Applying this standard of review, we
held that the commission correctly found that the
commonsense exemption applied, notwithstanding our
conclusion that the TALUP's *possible* environmental impact
was sufficient to require its treatment as a project. As we
reasoned, "When approving a project that is consistent with a
community plan, general plan, or zoning ordinance for which
an environmental impact report already has been certified, a
public agency need examine only those environmental effects
that are peculiar to the project and were not analyzed or were
insufficiently analyzed in the prior environmental impact
report." (*Id.* at pp. 388-389.) In restricting growth in areas of
the county affected by overflights, the TALUP merely
incorporated limits already imposed by existing general plan
and zoning provisions. (*Id.* at p. 389.) As a result, "any
potential displacement the TALUP might otherwise have
effected already has been caused by the existing land use
policies and zoning regulations to which the TALUP is keyed."
(*Ibid.*)

Under *Muzzy Ranch*, a local agency's task in
determining whether a proposed activity is a project is to
consider the potential environmental effects of undertaking the
type of activity proposed, "without regard to whether the
activity will actually have environmental impact." (*Muzzy*

*Ranch*, *supra*, 41 Cal.4th at p. 381.) Applying this test, our discussion of the TALUP's status as a project was brief and straightforward. We made no reference to any evidence in the record bearing on the *actual* impact of the TALUP on development in Solano County. Instead, the decision restricted itself to an examination of the potential effects that could reasonably be anticipated from adopting a land use policy of the type contained in the TALUP. Reasoning that population growth and resulting development can be anticipated in California counties, and that a policy capping development in one area might be expected to divert this growth to other areas of a county, we found the TALUP to be the sort of activity that could result in a physical change in the environment. (*Id.* at p. 383.)

To encapsulate the *Muzzy Ranch* test, a proposed activity is a CEQA project if, by its general nature, the activity is capable of causing a direct or reasonably foreseeable indirect physical change in the environment. This determination is made without considering whether, under the specific circumstances in which the proposed activity will be carried out, these potential effects will actually occur. Consistent with this standard, a "reasonably foreseeable" indirect physical change is one that the activity is capable, at least in theory, of causing. (Guidelines, § 15064, subd. (d)(3).) Conversely, an indirect effect is not reasonably foreseeable if there is no causal connection between the proposed activity and the suggested environmental change or if the postulated causal mechanism connecting the activity and the effect is so attenuated as to be "speculative." (*Ibid.*; e.g., *City of Livermore v. Local Agency Formation Com.* (1986) 184 Cal.App.3d 531, 541-543

[amendment of local agency formation commission guidelines to permit urban development outside cities constitutes a project]; *Kaufman & Broad-South Bay, Inc. v. Morgan Hill Unified School Dist.* (1992) 9 Cal.App.4th 464, 474 [creation of a Mello-Roos district for the purposes of funding an anticipated future school system in an undeveloped portion of the city not a project because "the causal link between the [formation of the district] and the alleged environmental impact (construction of new schools) is missing"].)

The somewhat abstract nature of the project decision is appropriate to its preliminary role in CEQA's three-tiered decision tree. Determination of an activity's status as a project occurs at the inception of agency action, presumably before any formal inquiry has been made into the actual environmental impact of the activity. The question posed at that point in the CEQA analysis is not whether the activity will affect the environment, or what those effects might be, but whether the activity's potential for causing environmental change is sufficient to justify the further inquiry into its actual effects that will follow from the application of CEQA. If the proposed activity is the sort that is capable of causing direct or reasonably foreseeable indirect effects on the environment, some type of environmental review is justified, and the activity must be deemed a project. CEQA analysis is then undertaken to evaluate the likelihood and nature of the project's environmental impacts, in order to determine the extent of environmental review required.

Only as so understood is the nature of the project decision consistent with the scope of appellate review. As noted, we evaluate that decision as a question of law, rather

than fact, to be decided on "undisputed data in the record on appeal." (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 382; see *San Mateo Gardens*, *supra*, 1 Cal.5th at p. 952 [whether an activity constitutes a project under CEQA is "a predominantly legal question"].) Given the often disputed nature of the real-world environmental impacts of a typical project and the discretion invested in an agency to make related factual findings, the environmental effects of a proposed activity can be reviewed as a matter of law only if the analysis is restricted to the effects that the activity is capable of causing, rather than those it actually will cause if implemented.

Our understanding of *Muzzy Ranch* is therefore somewhat different from *Rominger*'s understanding, which UMMP urges here. UMMP argues that *Muzzy Ranch*'s reference to "a categorical question respecting whether the activity is of a general kind with which CEQA is concerned" (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 381) makes it unnecessary to consider the substance of a proposed activity. Instead, UMMP argues, it is sufficient to know the nature of the agency action involved — for example, approval of a zoning amendment or of a permit for private land development. On the contrary, as our discussion demonstrates, *Muzzy Ranch* clearly requires a public agency to consider the substance of a proposed activity in determining its status as a project. What need not be considered is the activity's actual impact in the specific circumstances presented. As *Muzzy Ranch* noted, the analysis is conducted "without regard to whether the activity will *actually* have environmental impact." (*Ibid.*, italics added.) Similarly irrelevant is the specific type of governmental action required, so long as the proposed activity

satisfies one of the criteria for governmental involvement established in section 21065, subdivisions (a) through (c).[11]

Applying the foregoing test, we conclude the City erred in determining that the adoption of the Ordinance was not a project. Prior to the Ordinance, no medical marijuana dispensaries were legally permitted to operate in the City. The Ordinance therefore amended the City's zoning regulations to permit the establishment of a sizable number of retail businesses of an entirely new type. Although inconsistency with prior permissible land uses is not necessary for an activity to constitute a project (see *Muzzy Ranch*, *supra,* 41 Cal.4th at p. 388), establishment of these new businesses is capable of causing indirect physical changes in the environment. At a minimum, such a policy change could foreseeably result in new retail construction to accommodate the businesses. In addition, as UMMP suggests, the establishment of new stores could cause a citywide change in patterns of vehicle traffic from the businesses' customers, employees, and suppliers. The necessary causal connection between the Ordinance and these effects is present because adoption of the Ordinance was "an essential step culminating in action [the establishment of new

---

[11] The characterization of the project decision in *Muzzy Ranch* as a "categorical question" derives from the description of the relevant question as whether "the activity is of a *general kind* with which CEQA is concerned." (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 381, italics added.) Given the demonstrated potential for confusion in using the term, however, we now refrain from characterizing the project decision as a "categorical question." This will also avoid any confusion with "categorical exemptions," an unrelated concept.

businesses] which may affect the environment." (*Fullerton Joint Union High School Dist. v. State Board of Education* (1982) 32 Cal.3d 779, 797 (*Fullerton*).) The theoretical effects mentioned above are sufficiently plausible to raise the possibility that the Ordinance "may cause . . . a reasonably foreseeable indirect physical change in the environment" (§ 21065), warranting its consideration as a project.

Although UMMP raised these potential effects in the Court of Appeal, as well as other, less plausible effects, it framed them in the context of the specific circumstances it claimed to prevail in the City, hypothesizing various City-specific reasons why the Ordinance might indirectly produce physical changes. The Court of Appeal understandably rejected these specific impacts as speculative, given the absence of any evidence to support their occurrence. For the reasons discussed above, however, both UMMP's framing of the arguments in this manner and the court's rejection of them put the cart before the horse. The likely *actual* impact of an activity is not at issue in determining its status as a project.[12]

---

[12] The Court of Appeal misunderstood its task in reviewing the City's decision. Although the court noted *Muzzy Ranch*'s characterization of the project decision as requiring a "categorical approach," it ultimately described the required analysis in a very different way. Quoting *Wal-Mart Stores, Inc. v. City of Turlock* (2006) 138 Cal.App.4th 273, 290-291, the court held, " 'The correct analysis of the relevant physical change in the environment involves a comparison of (1) the physical conditions that existed at the time the Ordinance was proposed or approved with (2) forecasts of reasonably foreseeable future conditions that may occur as a result of the adoption of the Ordinance.' " (*Marijuana Patients*, *supra*,

Further, at this stage of the CEQA process virtually any postulated indirect environmental effect will be "speculative" in a legal sense — that is, unsupported by evidence in the record (e.g., *People v. Murtishaw* (2011) 51 Cal.4th 574, 591 ["defendant's claim . . . is entirely speculative, for he points to nothing in the record that supports his claim"]) — because little or no factual record will have been developed.  A lack of support in the record, however, does not prevent an agency from considering a possible environmental effect at this initial stage of CEQA analysis.  Instead, such an effect may be rejected as speculative only if, as noted above, the postulated causal mechanism underlying its occurrence is tenuous.

Finally, the City argues, in passing, that environmental review would be more appropriate at the time each dispensary applies for a conditional use permit, which is required by the Ordinance for operation of a dispensary.  We withhold comment on the significance of this argument for tiers two and three of the CEQA decision tree, but we note that the requirement of individual use permits does not prevent the Ordinance from being considered a project if section 21065 is otherwise satisfied.  As we observed in *Fullerton*, *supra*,

4 Cal.App.5th 103, 120.)  The test quoted from *Wal-Mart*, however, was not intended to govern the project decision but instead concerned the application of Guidelines section 15183, which permits "a streamlined environmental review for qualifying projects that are consistent with a general plan for which an EIR was certified." (*Wal-Mart*, *supra*, at p. 286; see *id*. at pp. 286-288.)  The project decision never arose in *Wal-Mart* because the court assumed that the activity under consideration was a project. (*Id*. at p. 286.)

32 Cal.3d at page 795, a local agency "cannot argue" that approval of a regulation is not a project "merely because further decisions must be made" before the activities directly causing environmental change will occur. The City argues that too little is known about the environmental impact of the Ordinance to permit effective environmental review at this stage, but that argument conflates the various tiers of CEQA review. (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 383 ["That further governmental decisions need to be made before a land use measure's actual environmental impacts can be determined with precision does not necessarily prevent the measure from qualifying as a project"].) At this initial tier in the CEQA process, the potential of the Ordinance to cause an environmental change requires the City to treat it as a project and proceed to the next steps of the CEQA analysis.

It ultimately might prove true that, in the context of the City, the actual environmental effects of the Ordinance will be minimal. It is possible, as the Court of Appeal assumed, that the City's commercial vacancy rate is sufficient to provide retail space for the new businesses without the need for expansion. (*Marijuana Patients*, *supra*, 4 Cal.App.5th at p. 123 [dispensaries "could simply cho[o]se to locate in available commercial space in an existing building"].) It is also possible, as UMMP suggests, that a significant number of unlicensed businesses selling medical marijuana already exist in the City and that the newly licensed businesses will simply displace them. Rather than causing increased traffic and other activity, the net effect of this substitution might be little or no additional environmental burden on the City. All of these factors can be explored in the second and, if warranted, third

tiers of the CEQA process. As to those tiers, we are in no position to offer, and do not express, an opinion on the applicability of the various exemptions or, alternatively, the appropriate level of environmental review.

## III. DISPOSITION

The judgment of the Court of Appeal is reversed. That court is directed to vacate the order of the superior court denying a writ of mandate and to remand the case to the trial court for further proceedings consistent with this opinion.


**CANTIL-SAKAUYE, C. J.**


**We Concur:**

**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Union of Medical Marijuana Patients, Inc. v. City of San Diego
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 4 Cal.App.5th 103
**Rehearing Granted**

_____

**Opinion No.** S238563
**Date Filed:** August 19, 2019
_____

**Court:** Superior
**County:** San Diego
**Judge:** Joel R. Wohlfeil

_____

**Counsel:**

Channel Law Group, Jamie T. Hall and Julian Killen Quattlebaum for Plaintiff and Appellant.

Jan I. Goldsmith and Mara W. Elliott, City Attorneys, George F. Schaefer, Assistant City Attorney, Glenn T. Spitzer and M. Travis Phelps, Deputy City Attorneys, for Defendant and Respondent.

Best Best & Krieger, Michelle Ouellette, Charity Schiller and Sarah E. Owsowitz for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendant and Respondent.

No appearance for Real Party in Interest.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jamie T. Hall
Channel Law Group
8383 Wilshire Boulevard, Suite 750
Beverly Hills, CA 90211
(310) 982-1760

Julian K. Quattlebaum
Channel Law Group
8383 Wilshire Boulevard, Suite 750
Beverly Hills, CA 90211
(310) 982-1760

M. Travis Phelps
Deputy City Attorney
Office of the City Attorney
1200 Third Avenue, Suite 1100
San Diego, CA 92101-4100
(619) 533-5800