**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SAN FRANCISCO TAXI COALITION; PATRICK O'SULLIVAN; GEORGE HORBAL; ALLIANCE CAB; S.F. TOWN TAXI INC.; SAI LEE, *Plaintiffs-Appellants*, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO; SAN FRANCISCO MUNICIPAL TRANSIT AGENCY; JEFFREY TUMLIN, Director of Transportation, *Defendants-Appellees.* | No. 19-16439 <br><br> D.C. No. 3:19-cv-01972-WHA <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
William Alsup, District Judge, Presiding

Submitted July 16, 2020[*]
San Francisco, California

Filed November 9, 2020

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

Before:  Kenneth K. Lee and Patrick J. Bumatay, Circuit
Judges, and Roslyn O. Silver,** District Judge.

Opinion by Judge Lee

---

**SUMMARY***

**Civil Rights**

The panel affirmed the district court's judgment on the
pleadings in favor of defendants, but remanded for the
district court to consider whether plaintiffs should be given
leave to amend some of their state law claims in an action
challenging regulations adopted in 2018 by the San
Francisco Municipal Transportation Agency which favored
recent owners of taxi permits (called "medallions") over
those who obtained their permits years ago.

The 2018 regulations favored taxi drivers who recently
obtained medallions from the City of San Francisco for
$250,000—only to see ridership dry up in the face of Uber
and Lyft and other ride-sharing services.  For example, the
2018 regulations gave priority for lucrative airport pick-up
rides to recent medallion owners.  Several taxi drivers, as
well as groups representing them, challenged the 2018
regulations as violating equal protection, substantive due

---

** The Honorable Roslyn O. Silver, United States District Judge for
the District of Arizona, sitting by designation.

*** This summary constitutes no part of the opinion of the court.  It
has been prepared by court staff for the convenience of the reader.

process, the California Environmental Quality Act (CEQA), and state anti-age discrimination law.

The panel held that rational basis review applied to the equal protection claim because this case did not implicate suspect or quasi-suspect classifications. The panel held that the 2018 regulations were rationally related to the legitimate government interests of aiding beleaguered taxi drivers and easing taxi congestion at the airport. The panel held that the City's attempt to mitigate the fallout for those most affected by a shift in the taxi market was a permissible state purpose, even if some questioned its policy wisdom. The panel also rejected plaintiffs' invocation of substantive due process to strike down the 2018 regulations.

The panel held that plaintiffs' pleadings failed to plausibly allege that the 2018 regulations qualified as a project under CEQA. The panel further held that plaintiffs failed to plausibly allege that the 2018 regulations were governed by California Government Code section 11135, forbidding state actions that discriminate based on age. The panel remanded for the district court to consider granting leave to amend those claims in the event the taxi drivers could allege additional facts to support them.

## COUNSEL

Kenneth A. Brunetti and Gregory A. Rougeau, Brunetti Rougeau LLP, San Francisco, California, for Plaintiffs-Appellants.

Dennis J. Herrera, City Attorney; Wayne K. Snodgrass, Aileen M. McGrath, and James M. Emery, Deputy City Attorneys; City Attorney's Office, San Francisco, California; for Defendants-Appellees.

## **OPINION**

LEE, Circuit Judge:

Uber, Lyft, and other ride-sharing services have been a boon for commuters, but not so much for taxi drivers. Particularly hard hit are taxi drivers who recently obtained taxi permits (called "medallions") from the City of San Francisco for $250,000 — only to see ridership dry up in the face of disruptive technology. In part to aid these taxi drivers, the San Francisco Municipal Transportation Agency (SFMTA) established several rules favoring recent owners of taxi medallions over those who obtained theirs years ago. So, for example, the new rules give priority for lucrative airport pick-up rides to recent medallion owners.

Several taxi drivers, as well as groups representing them, challenged these new rules as violating equal protection, substantive due process, the California Environmental Quality Act (CEQA), and state anti-age discrimination law. The district court granted the government's motion for judgment on the pleadings, ruling that the taxi drivers failed to state plausible claims. We affirm. The rules are rationally related to the legitimate government interests of aiding beleaguered taxi drivers and easing taxi congestion at the airport.  We also affirm the judgment on the CEQA and age discrimination claims, but we remand for the district court to consider granting leave to amend those claims in the event the taxi drivers can allege additional facts to support them.

## BACKGROUND

### I. San Francisco Enacts Rules Favoring Recent Taxi Medallion Owners.

The SFMTA regulates taxis in San Francisco as well as taxi traffic at San Francisco International Airport (SFO). Importantly here, it issues taxi "medallions" to operate within the City. In 1978, San Francisco voters approved Proposition K, which established different rules depending on whether the taxi driver acquired the medallion before or after the passage of Proposition K (*i.e.*, "Pre-K" or "Post-K" medallions). In 2010, the SFMTA enacted regulations further changing the medallion structure, resulting in three classes: Pre-K (pre-1978), Post-K (1978 to 2010), and Purchased medallions (post-2010). The precise differences among the classes are not relevant here, other than that Purchased medallion owners paid $250,000 to the City for each medallion.

Shortly after Purchased medallion owners began ponying up a quarter-of-a-million dollars to buy taxi medallions, ride-sharing services such as Uber and Lyft disrupted the taxi industry. SFMTA retained consultants to study the changing taxi market. The report found that Purchased medallion holders faced severe financial hardship because of high debt loads joined with fare loss to ride-sharing services. It also determined that taxi drivers clustered at SFO in search of high-value fares, causing significant congestion and long wait times.

In response to the consultants' report, SFMTA adopted numerous regulations (the "2018 Regulations"), some of which are the focus of this litigation. Pre-K medallion holders are now prohibited from picking up fares at SFO, and Post-K medallion holders are disfavored from pickups

with priority given at a fluctuating ratio to Purchased medallion holders depending on demand.

## II. Several Pre-K and Post-K Medallion Holders Sue the Government.

The plaintiffs (the "Drivers") sued San Francisco, the SFMTA, and its director (collectively, the "City") in state court. The Drivers claimed, among other things, violations of substantive due process and equal protection under both state and federal constitutions, the California Environmental Quality Act, and anti-age discrimination law under California Government Code section 11135. The City removed to federal court and filed a motion for judgment on the pleadings. The district court granted the motion and entered judgment dismissing the case. The district court held that the challenged 2018 Regulations furthered three legitimate state interests: decrease congestion at the airport, increase taxi service within the city, and minimize financial fallout for Purchased medallion holders "who have been disproportionately crushed by the industry downturn." The court also held that the 2018 Regulations were not a "project" under CEQA. Finally, the court found the complaint lacked allegations sufficient to state a claim sounding in state anti-age discrimination law.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291, and review judgments on the pleadings de novo. *See Fajardo v. Cty. of Los Angeles*, 179 F.3d 698, 699 (9th Cir. 1999). This analysis is "'substantially identical' to analysis under Rule 12(b)(6)." *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (internal citation omitted). Judgment "is properly granted when, 'taking all the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of

law.'" *Gregg v. Haw.*, *Dep't of Pub. Safety*, 870 F.3d 883, 887 (9th Cir. 2017) (quoting *Nelson v. City of Irvine*, 143 F.3d 1196, 1200 (9th Cir. 1998)).

## ANALYSIS

## I. The Drivers' Equal Protection and Substantive Due Process Claims Lack Merit.

The Drivers have failed to plausibly allege that the 2018 Regulations violate equal protection or substantive due process.[1]

Rational basis review applies to the equal protection claim here because this case does not implicate suspect or quasi-suspect classifications. *See Ball v. Massanari*, 254 F.3d 817, 823 (9th Cir. 2001). Under that standard, we ask "whether the legislation bears a rational relationship to a legitimate state interest." *Jackson Water Works, Inc. v. Pub. Utils. Comm'n*, 793 F.2d 1090, 1093–94 (9th Cir. 1986). "Where a regulation or statute affects only economic . . . interests," as here, "the state is free to create any classification scheme that does not invidiously discriminate." *Id.* at 1093. We must uphold the law if there

---

[1] The Drivers brought claims under both federal and state constitutional provisions. We analyze their claims in unison because California law is functionally identical to federal law in this area. *See, e.g.*, *Manduley v. Superior Court*, 27 Cal. 4th 537, 571 (2002) (equating state equal protection analysis to federal analysis); *Love v. State Dep't of Educ.*, 29 Cal. App. 5th 980, 989 (2018) (applying federal law to a state substantive due process claim); *but see Barri v. Workers' Comp. Appeals Bd.*, 28 Cal. App. 5th 428, 462 (2018) ("Analysis under [the due process clause of the California Constitution] differs from that conducted pursuant to the federal due process clause in that the claimant need not establish a property or liberty interest as a prerequisite to invoking due process protection.") (internal citations omitted).

are "'plausible,' 'arguable,' or 'conceivable' reasons which may have been the basis for the distinction." *Id.* at 1094 (quoting *Brandwein v. Cal. Bd. of Osteopathic Exam'rs*, 708 F.2d 1466, 1472 (9th Cir. 1983)).

Here, the 2018 Regulations rationally serve legitimate purposes, and the Drivers fail to state a plausible claim otherwise. The City provides three interests motivating the 2018 Regulations: (1) reducing traffic congestion at the airport; (2) encouraging drivers to service the City; and (3) mitigating economic fallout for Purchased medallion owners.

There can be no dispute that the first two interests are legitimate. *See, e.g.*, *Sproles v. Binford*, 286 U.S. 374, 394 (1932) (preservation and management of a state's highway system, including "fair distribution of traffic," is a legitimate interest). The Drivers concede that taxi operators cluster at SFO because those riders offer high-value fares compared to trips within the City. They also admit that an oversupply of taxis at SFO leads to a shortage within the City.

The parties focus mainly on the third proffered interest — alleviating economic harm for Purchased medallion holders. The Drivers claim that the 2018 Regulations are pretext for impermissibly propping up the Purchased medallion market. But the only case cited in support is *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985). That case involved "an irrational prejudice against the mentally retarded." *Id.* at 450. The Drivers, however, do not allege any similar irrational prejudices. Instead, their claim boils down to simple disagreement with the City's efforts to balance the economic benefits and burdens of a regulated industry.

The Drivers also claim that the City's actions amount to impermissible economic favoritism. For this, the Drivers cite our court's opinion in *Merrifield v. Lockyer*, 547 F.3d 978, 991 (9th Cir. 2008). *Merrifield* involved a state law requiring controllers of non-vertebrate animals to obtain a pesticide license but did not require it for those controlling vertebrate animals. *See id.* at 988–89. The appellant there claimed that the distinction based on the type of pest controlled violated equal protection. *See id*. The *Merrifield* court held that the law failed rational basis review because there simply was no reasonable basis for the difference in treatment: the licensing scheme "specifically singles out pest controllers like Merrifield," and was supported by "a rationale so weak that it undercuts the principle of non-contradiction." *Id.* at 991. The court favorably cited a Sixth Circuit decision holding that "the singling out of a particular economic group, with no rational or logical reason for doing so, was strong evidence of an economic animus with no relation to public health, morals or safety." *Id.* at 989 (citing *Craigmiles v. Giles*, 312 F.3d 220, 227–29 (6th Cir. 2002)). The Drivers latch onto a single footnote in *Merrifield* to argue that the City's taxi rules do not pass muster under rational basis review: "[M]ere economic protectionism for the sake of economic protectionism is irrational with respect to determining if a classification survives rational basis review." *Id.* at 991 n.15.

Not so here. Softening the economic fallout for Purchased medallion holders is a permissible state purpose and not a "naked attempt to raise a fortress" around them to insulate them from competition. *Craigmiles*, 312 F.3d at 229. The regulations do not single out Purchased medallion holders for favorable treatment with "no rational or logical reason for doing so." *Merrifield*, 547 F.3d at 989. Rather, the rational reason is plain: Purchased medallion

holders bought or financed expensive permits from the City only to have the rug pulled out from under them by an unexpected disruptive technology. That the City would try to mitigate the fallout for those most affected by a shift in the market is a permissible state purpose, even if some may question its policy wisdom.

*Merrifield* stands for the unremarkable proposition that no rational basis exists if the law lacks *any* legitimate reason for its adoption. The Drivers ask us to read *Merrifield* to mean something much more. For better or for worse, governmental regulations today typically benefit some groups and burden others. So long as there are other legitimate reasons for the economic distinction, we must uphold the state action. In short, *Merrifield* provides an outer limit to the state's authority if the state's action borders on corruption, pure spite, or naked favoritism lacking any legitimate purpose. This case, however, does not come close to that outer bound.

The Drivers also claim that the 2018 Regulations fail to advance the stated interests because they do not increase taxi service within the City or decrease congestion at SFO. The record suggests otherwise. Taxis routinely circle the airport waiting for a ride, while riders in the City experience long wait times because hundreds of taxis sit idle at the airport. Moreover, the Drivers do not appear to argue that the 2018 Regulations fail to advance the goal of minimizing economic fallout to Purchased medallion holders. That concession alone is enough to end the inquiry. *See Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012) (the burden is on the challenging party to "negative every conceivable basis which might support it") (internal quotations and citation omitted).

Finally, while the Drivers (for good reason) do not explicitly raise the revival of *Lochner*, they allude to the specter of substantive due process. *See Lochner v. New York*, 198 U.S. 45 (1905).**[2]** They implicitly invite this court to engage in a free-wheeling policy judgment and invoke substantive due process to strike down a law that they believe is inequitable and ill-advised. But the *Lochner* Monster submerged decades ago and should not resurface. *See, e.g.*, *Stop the Beach Ren., Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 721 (2010) (warning against reasoning that "propels us back to . . . 'the *Lochner* era'").**[3]**

## II.  The 2018 Regulations Do Not Qualify as a "Project" Under CEQA.

The district court properly held that, based on the allegations in the complaint, the 2018 Regulations do not qualify as a "project" under CEQA.  CEQA sets forth a three-tiered system to evaluate agency action for environmental effects:

> First, the agency must determine whether the proposed activity is subject to CEQA at all. Second, assuming CEQA is found to apply, the agency must decide whether the activity qualifies for one of the many exemptions that

---

**[2]** The complaint included a substantive due process claim, and the Drivers' briefing references "substantive due process" several times, though it never articulates an argument based on it.

**[3]** *But see* David E. Bernstein, *Rehabilitating Lochner* (2011) (arguing that the Supreme Court correctly decided *Lochner* and that it has been unfairly maligned); *cf. also Loch Ness Monster 'might be real' after scientists make 'surprising' discovery*, BBC (June 3, 2019), https://www.bbc.co.uk/newsround/48499253.

> excuse otherwise covered activities from CEQA's environmental review. Finally, assuming no applicable exemption, the agency must undertake environmental review of the activity[.]

*Union of Med. Marijuana Patients, Inc. v. City of San Diego*, 7 Cal. 5th 1171, 1185 (2019).

Relevant to this appeal is the first tier, which requires the agency to "conduct a preliminary review to determine whether the proposed activity constitutes a 'project' for purposes of CEQA." *Id.* To do this, an agency looks to the "general nature" of a proposed action to determine whether "the activity is capable of causing a direct or reasonably foreseeable indirect physical change in the environment." *Id.* at 1197. "[A]n indirect effect is not reasonably foreseeable if . . . the postulated causal mechanism connecting the activity and the effect is so attenuated as to be 'speculative.'" *Id.* If the activity is not a project under CEQA, then the action is not subject to CEQA at all. *See Muzzy Ranch Co. v. Solano Cty. Airport Land Use Comm'n*, 41 Cal. 4th 372, 380 (2007).

The nub of the Drivers' argument is that the 2018 Regulations potentially impact the environment by increasing "deadhead" trips to and from SFO. They argue that Pre-K and Post-K medallion holders will still transport passengers to the airport, but now they will be inclined or required to return to the City without passengers. Similarly, Purchased medallion holders with priority at SFO will make trips without passengers to the airport to secure high-paying fares shuttling riders back into the City. This, the Drivers claim, "will encourage and promote hundreds of additional trips on Highway 101 [daily]."

But the complaint has not plausibly alleged that the 2018 Regulations increase the number of taxis in circulation or authorize more fares.  Instead, they merely allocate existing fares among classes of medallion holders. Put another way, the taxis will continue to operate — and produce emissions and traffic — no matter if they are driving to and from SFO or within the City. At least based on the complaint, the assertion of significant environmental change appears to rest on speculation. Thus, the 2018 Regulations are not a project per CEQA, and the Drivers pleadings fail to plausibly claim otherwise.[4]

## III.    The Drivers' Age Discrimination Claim Fails.

The Drivers argue that the 2018 Regulations violate state anti-age discrimination law.  But the Drivers fail to plausibly allege in their complaint that the 2018 Regulations are governed by California Government Code section 11135 forbidding state actions that discriminate based on age. California law provides in relevant part: "No person in the State of California shall, on the basis of . . . age . . . be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is . . . administered by the state . . . , is funded directly by the state, or receives any financial

---

[4] The California Supreme Court's recent decision, *Union of Medical Marijuana Patients, Inc. v. City of San Diego*, 7 Cal. 5th 1171 (Cal. 2019), is not to the contrary.  The court there acknowledged that potential increased traffic arising from 30 new marijuana dispensaries may implicate CEQA, but that was in large part because those marijuana establishments may "result in retail construction to accommodate the businesses." *See id.* at 1199. *Cf. also* Harold & Kumar Go to White Castle (2004) (the two protagonists in the film embark on a long journey to find sustenance after partaking in certain recreational activity). The complaint here does not allege such compounding traffic problems.

assistance from the state." Cal. Gov't Code § 11135(a). The relevant "hook" here is whether the state has provided funding or financial assistance. The Drivers allege in their pleadings only one fact on the matter: "The SFMTA receives state funding, including but [not] limited to, State Transit Assistance funds, for a variety of its transportation programs and activities."

The Drivers essentially argue in their pleadings that because the SFMTA receives state funding for various programs, every subsequent action by the SFMTA triggers section 11135's prohibitions. The City counters that the state funding must be directed to the program challenged — the taxi medallion program in this case.

*Comunidad en Accion v. L.A. City Council* is instructive here. 219 Cal. App. 4th 1116 (2013). There, a local community group challenged Los Angeles's siting decision for a solid waste processing facility under section 11135. *See id.* at 1121. The City's Planning Department ultimately made the siting decision. *See id.* at 1121–22. The community group asserted that section 11135 applied because one of the City's governmental units, the Local Enforcement Agency (LEA), received state funding for inspections of solid waste facilities. *See id.* at 1122–23. The *Comunidad en Accion* court held that for purposes of summary judgment, "the state grants made to the LEA do not raise a triable issue of material fact indicating that the alleged violations of section 11135 were part of a City program receiving state funding." *Id.* at 1124. This was so despite the LEA being "housed in the City Department of Building and Safety" and staffed by City employees. *Id.* at 1122. The court reasoned that because the LEA had an "independent legal existence" from the City, receipt of state funds by the LEA did not provide a nexus for section 11135 to cover the rest of the City's actions. *Id.* at

1128. The court noted that to hold otherwise would be "inconsistent with section 11135" because it would require finding that state funds directed to any number of city departments (including the library, police, and parks and recreation, among others) "would constitute funding of the waste management program." *Id.* at 1128–29. Put another way, the state's infusion of money into one arm of local government does not necessarily reach all limbs and digits of that government and thus it does not extend the state's anti-discrimination law to every local government activity.

Returning to San Francisco and taxis, the Drivers make only the bare assertion that because the SFMTA generally receives some unknown quantity of state funding, section 11135 applies to the taxi medallion program. Based on that cursory allegation in the complaint, the Drivers have not plausibly alleged that section 11135 governs the taxi medallion system.

## CONCLUSION

We **AFFIRM** the district court's grant of the City's motion for judgment on the pleadings.  We remand, however, for the district court to consider whether the plaintiffs should be given leave to amend their state law claims.