Filed 1/29/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CALIFORNIA ADVOCATES FOR NURSING HOME REFORM et al., <br>     Plaintiffs and Appellants, <br> v. <br> TOMÁS J. ARÁGON, as Director, etc., <br>     Defendant and Respondent. | A158035 <br><br> (Alameda County Super. Ct. No. RG 12653326) |

California law requires a license from the California Department of Public Health (CDPH) in order to operate or manage a skilled nursing facilities (SNF). A licensee, however, may subsequently enter into an agreement with a management company for the management company to operate or manage the licensee's SNF. In this circumstance, the management company does not itself hold the license to operate the SNF, but is subject to an application and approval process with CDPH in order to manage the SNF.[1]

In the case before us, the parties requested the trial court answer, as a threshold matter, a specific legal question: does CDPH approval of unlicensed management companies to operate licensed SNFs violate state or federal law? The trial court concluded it did not.

---

[1] In this opinion, we refer to such management companies as "unlicensed management companies."

1

Plaintiffs now appeal a judgment of dismissal following entry of that order, arguing that these management agreements are illegal because the licensee (*not* an unlicensed management company) must operate and manage the SNF. We affirm.

**FACTUAL & PROCEDURAL BACKGROUND**

Plaintiffs non-profit California Advocates for Nursing Home Reform (CANHR), Gail Dawson and Java Williams (collectively plaintiffs) filed the operative third amended complaint (Complaint) in January 2015. The named defendants were Dr. Ron Chapman, in his capacity as then-director of the CDPH (CDPH Director);[2] Country Villa Service Corp. (CVSC); Country Villa East L.P., C.V. Westwood Single Purpose Entity, LLC; and Steven Reissman, individually and as trustee of the Reissman Family Trust (collectively the Country Villa defendants).

Plaintiff CANHR is a non-profit organization "dedicated to improving the care, quality of life, and choices for California's long term care customers" with "[o]ne or more members" who are residents and former residents of facilities operated and managed by CVSC and the Country Villa defendants. Plaintiff Dawson is the administrator of the estate of Minnie Bell Green, and plaintiff Williams is the successor in interest to her mother Suzanne Williams. Prior to their deaths, both Green and Suzanne Williams were residents at a SNF operated by CVSC.

The Country Villa defendants are licensed by the CDPH to operate SNFs in California. The Complaint attached a Management

---

[2] Dr. Chapman was replaced by Dr. Karen Smith as CDPH Director shortly after the filing of the Complaint. Dr. Smith was replaced by Dr. Tomás Aragón in January 2021.

2

Services Agreement between the County Villa defendants and CVSC, a corporation engaged in the nursing home business as a management company, to operate a SNF in North Hills, California. This Management Services Agreement is allegedly representative of similar agreements executed by CVSC to operate other SNFs in California.

These management agreements are "the principal subject of this action." Specifically, plaintiffs assert that state law requires that a SNF be operated and managed by the entity that holds the license to operate the SNF, *not* by a management company. Accordingly, plaintiffs allege that CDPH's approval of applications and agreements for companies like CVSC to operate and manage licensed SNFs violates state law.

The Complaint asserts five causes of action. The first cause of action, against only the CDPH Director, seeks declaratory relief that management arrangements transferring the day-to-day operation of SNFs to unlicensed management companies violate California law and are invalid as in conflict with federal law. The second and third causes of action, against all defendants, seek declaratory relief that management arrangements providing fees that exceed the cost of providing management services, plus a reasonable allowance for profit, violate California's Unfair Competition Law (Bus. & Prof. Code § 17200) (UCL)) and other state law. The fourth cause of action, against only the CDPH Director, seeks injunctive relief to prohibit the CDPH Director from approving any management agreement, except those submitted by a proposed licensee seeking to acquire ownership of a SNF operation, and to require the CDPH Director to give notice that any previously approved management agreements are invalid. The

3

fifth cause of action seeks injunctive relief, accounting, and restitution to redress the alleged overpayment of management fees, which "are in reality distributions of profit from [the licensees] and bear no relation to the cost of providing management services by CVSC and Reissman."

The trial court sustained defendants' demurrers without leave to amend on the ground that plaintiffs lacked standing. Plaintiffs appealed. As to the second, third, and fifth causes of action, we affirmed as the Complaint offered "only the barest allegations" that plaintiffs' claimed injuries were caused by the management agreements or by the fees charged under those agreements, and thus failed to establish plaintiffs' standing. (*California Advocates for Nursing Home Reform v. Smith* (Aug. 9, 2016, A145267) [nonpub. opn.] at p. 5.) As to the first and fourth causes of action against the CDPH Director, we reversed: "Plaintiffs' complaint presents a clear-cut question of whether the department may authorize an unlicensed entity to operate skilled nursing facilities, and there would be a strong public interest in prohibiting it from doing so if such authorization were determined to violate state law." (*Id.* at pp. 3.) We noted that the merits of this legal question had not been decided in the trial court and, accordingly, determined that plaintiffs had standing on the first and fourth causes of action to determine whether CDPH "is complying with its statutory obligations in this respect." (*Id.* at pp. 3-4.)

On remand, the parties requested that this "clear-cut question" be addressed by the trial court as a threshold matter. The trial court did so in an order dated February 5, 2018, concluding that approval of unlicensed management companies to operate licensed SNFs does not violate state or federal law. The order made it clear that the question

4

of whether a particular agreement (such as the Management Services Agreement attached to the Complaint) violates state and federal law was not contemplated or reached.

The CDPH Director moved for summary judgment on the grounds that plaintiffs lacked standing to challenge the individual management agreements and that the remaining causes of action did not allege that any individual management agreement violated any law. The trial court granted the motion. It concluded that the discrete issue raised in the first cause of action (legality of management agreements to operate a licensed SNF) had been determined against plaintiffs in the February 5, 2018 order, and that the underlying misconduct alleged in the fourth cause of action (approval of such management agreements) was based on the failed first cause of action. The trial court noted that its February 5, 2018 order explicitly did not reach the issue of whether approval of a specific management agreement "might be unlawful because it improperly eviscerated the responsibilities of the licensee" and explained that such a claim was not alleged in the Complaint. The trial court also noted that, to the extent plaintiffs still sought declaratory relief as to the illegality of the particular CVSC management agreements, such relief was foreclosed by this court's determination that plaintiffs lacked standing to seek such relief. The trial court dismissed the complaint with prejudice and plaintiffs timely appealed.

## DISCUSSION

This court's August 9, 2016 decision, the trial court's February 5, 2018 order, and the parties' briefing in this appeal direct us to answer the same specific legal question addressed by the trial court: Does

5

CDPH approval of unlicensed management companies to operate licensed SNFs violate state or federal law?

"Statutory interpretation is 'an issue of law, which we review de novo.'" (*Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1183, quoting *United Riggers & Erectors, Inc. v. Coast Iron & Steel Co.* (2018) 4 Cal.5th 1082, 1089.) "Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose." (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.) "We first examine the statutory language, giving it a plain and commonsense meaning." (*Ibid.*) "If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." (*Ibid.*) With these principles in mind, we turn first to the licensing and approval requirements for SNFs found in Health & Safety Code section 1250 et seq.[3]

## I.  HEALTH & SAFETY CODE LICENSING PROVISIONS

Section 1250 et seq. establish licensing requirements for health facilities. For the purposes of these requirements, a SNF is defined as "a health facility that provides skilled nursing care and supportive care to patients whose primary need is for availability of skilled nursing care on an extended basis." (§ 1250, subd. (c).)

---

[3]    Unless otherwise indicated, all further section references will be to the Health and Safety Code.

Sections 1250 through 1263 are included as "Article 1. General" provisions. Section 1253 states, in relevant part: "No person, firm, partnership, association, [or] corporation . . . . shall operate, establish, manage, conduct, or maintain a health facility in this state, without first obtaining a license therefor as provided in this chapter . . . ." (§ 1253, subd. (a).)

Sections 1265 through 1271.25 are included as "Article 2. Administration" provisions. Section 1265 provides that an entity seeking "a license for a health facility" or "approval to manage a health facility currently licensed as a health facility" must file a verified application with the CDPH. (§ 1265.) Accordingly, the process for *either* (1) approval to obtain a license for a SNF, *or* (2) approval to manage a SNF falls under the same framework and contains many of the same requirements. For example, an applicant must submit satisfactory evidence that it is (1) of "reputable and responsible" character; and (2) able to "comply with this chapter and of rules and regulations promulgated under this chapter by the department." (§ 1265, subds. (e)–(f).)

An applicant for a license is, however, subject to some unique requirements. For example, an applicant for a license must submit satisfactory evidence that it "possesses financial resources sufficient to operate the facility for a period of at least 45 days." (§ 1265, subd. (g).) A management company is not required to submit this information for approval to manage a SNF. (*Ibid.*) Additionally, an application for a license may be denied if the applicant has been convicted of a "crime," defined as a violation of a law or regulation that is substantially related

7

to the applicant's qualifications or duties, or to the functions of the business for which the license is to be issued. (§§ 1265.1, 1265.2.)

Applicants for a license are also subject to specific disclosure requirements. For example: *"If the facility is operated by, or proposed to be operated in whole or part under, a management contract*, the names and addresses of any person or organization, or both, having an ownership or control interest of 5 percent or more in the management company shall be disclosed to the state department . . . ." (§ 1267.5, subd. (a)(3)(A) (section 1267.5(a)(3)(A)), italics added.) In other words, section 1267.5(a)(3)(A) requires that a licensee make certain disclosures if a SNF is to be "operated," either "in whole or part," by a management company pursuant to a management agreement. (*Ibid.*)

Here, plaintiffs contend that section 1253 should be interpreted to prohibit the operation of a licensed SNF by an unlicensed management company, and that section 1267.5(a)(3)(A) should be rewritten to replace the term "operated" with the term "managed."

We do not find the argument persuasive. " 'A court must, where reasonably possible, harmonize statutes, reconcile seeming inconsistencies in them, and construe them to give force and effect to all of their provisions.' " (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 805, quoting *Hough v. McCarthy* (1960) 54 Cal.2d 273, 279.) As described above, section 1267.5(a)(3)(A) specifically contemplates the operation of a SNF by a management company through a management agreement with the licensee. The plain language of section 1267.5(a)(3)(A) thus supports the operation of a licensed SNF by an unlicensed management company.

8

We view Section 1253, on the other hand, as a more general prohibition that a SNF cannot be operated or managed "without first obtaining a license" to operate that SNF. (§ 1253, subd. (a).) There is nothing in the provision that precludes a licensee, *after* having obtained a license, from then entering into an agreement with a management company to operate the SNF. Accordingly, we conclude that section 1253 can be construed in a manner that is consistent with section 1267.5(a)(3)(A) and allows for the operation of a licensed SNF by an unlicensed management company.

The legislative history regarding the application and approval process for management companies reinforces our conclusion. In 2000, the Legislature amended section 1265 to require that an entity seeking to manage a licensed SNF obtain CDPH approval. (Stats. 2000, ch. 451, § 4, p. 3278 (Assem. Bill No. 1731).) The Legislature appeared to understand the requirement of section 1253: "Existing law prohibits the operation, establishment, management, conduct, or maintenance of a health facility without having first obtained a license, or the continued operation, conduct, or maintenance of an existing health facility without having obtained a license." (Legis. Counsel's Dig., Assem. Bill 1731 (1999-2000 Reg. Sess.) ¶3.) Nevertheless, it amended section 1265 to "require the filing of an application for approval to manage a currently licensed skilled nursing facility[.]" (*Id.* at ¶6.) In adopting this amendment, the Legislature evidently agreed that an unlicensed management company could manage a SNF that was already licensed.

Moreover, in 2001, the Legislature amended section 1265 again to exempt management companies from the application requirement in

9

subdivision (g) to present satisfactory evidence of financial resources sufficient to operate a SNF for at least 45 days. (Stats. 2001, ch. 685 § 3, p. 5380 (Assem. Bill No. 1212); see Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1131 (2001–2002 Reg. Sess.) as amended Aug. 28, 2001, p. 1.) This requirement was deemed inapplicable to management companies, as "[t]hese companies *manage day-to-day operations* and are not ultimately responsible for financial operations." (Assem. Com. on Appropriations, Analysis of Assem. Bill No. 1212 (2001–2002 Reg. Sess.) as amended Mar. 28, 2001, p. 1, italics added.) This legislative history demonstrates that, consistent with the plain language of 1267.5(a)(3)(A), an unlicensed management company may operate a licensed SNF.

Contrary to plaintiffs' suggestion, this plain meaning interpretation does not limit the scope of responsibility held by the licensee. It is clear that, even if management companies are running the day-to-day operations, the licensee is still ultimately responsible for those operations. For example, CDPH's regulations provide that the licensee of a SNF "shall be responsible for compliance with licensing requirements and for the organization, management, operation and control of the licensed facility." (Cal. Code Regs., tit. 22, § 72501, subd. (a), italics added.) The regulations are explicit that "*delegation of any authority by a licensee shall not diminish the responsibilities of such licensee.*" (*Ibid.*) Accordingly, the operation of a SNF by an unlicensed management company does not diminish the continuing responsibility of a licensee to its SNF.

## II. NURSING HOME ADMINISTRATOR PROVISIONS

Beyond the provisions of section 1250 et seq., plaintiffs also argue that the operation of licensed SNFs by unlicensed management companies is prohibited by statutory provisions and CDPH regulations governing nursing home administrators.

Section 1416 et seq. establishes the Nursing Home Administrator Program, which licenses and regulates nursing home administrators. (§§ 1416, 1416.1.) Section 1416.2, subdivision (a)(5), defines a nursing home administrator as an "individual educated and trained within the field of nursing home administration who carries out the policies of the licensee of a nursing home" and is "charged with the general administration of a nursing home, regardless of whether he or she has an ownership interest and whether the administrator's function or duties are shared with one or more other individuals." Section 1416.68, subdivision (a) states that it is the responsibility of the nursing home administrator to "plan, organize, direct, and control the day-to-day functions of a facility."

CDPH's regulations require that each SNF must "employ or otherwise provide an administrator to carry out the policies of the licensee." (Cal. Code Regs., tit. 22, § 72513, subd. (a).) The administrator can be responsible for only one SNF as a general rule, but can be responsible for up to three facilities if certain other conditions are met. (*Id.*, subd. (a)(2).) Federal regulations similarly recognize the role of an administrator, who is appointed by the governing body of the facility and is "[r]esponsible for the management of the facility." (42 C.F.R. § 483.70(d)(2).)

11

Here, plaintiffs do not argue that SNF licensees explicitly designate management companies as nursing home administrators under these definitions. Instead, plaintiffs contend that the operation of a SNF by a management company improperly limits the authority of a nursing home administrator.

Again, we do not find the argument persuasive. Section 1416.68, subdivision (a) sets out the responsibilities of the administrator. Then, mirroring the language in CDPH's regulations, subdivision (d) of section 1416.68 states: "[D]elegation of any authority by a licensee shall not diminish the responsibilities of that licensee." This provision makes clear that the delegation of operations to an unlicensed management company does not limit the continuing responsibility of the licensee or its nursing home administrator.

In sum, we conclude that CDPH approval of unlicensed management companies to operate licensed SNFs does not violate state or federal law. Like the trial court, we do not reach the legality of any particular management agreement, including the Management Services Agreement attached to the Complaint. This court's August 9, 2016 decision made clear that plaintiffs lacked standing to bring such a challenge. (*California Advocates for Nursing Home Reform v. Smith* (Aug. 9, 2016, A145267) [nonpub. opn.] at p. 5.) Plaintiffs' remaining claims presented a "clear-cut" legal question as to whether the CDPH's approval of unlicensed management companies to operate licensed SNFs violated the law. (*Id.* at p. 3.) Per the parties' request, the trial court answered that legal question as a threshold matter, which disposed of plaintiffs' claims. We reach the same answer here.

12

We also reject plaintiffs' request that this court declare that each management agreement (either to be presented to the CDPH for approval or currently in effect) contain certain language to "uphold the primacy of the authority of the licensee and its administrator." Such relief was not requested in the Complaint and was not raised in the trial court. (*Estate of Westerman* (1968) 68 Cal.2d 267, 279 ["[N]o reason appears why we should not apply the established rules that a party to an action may not, for the first time on appeal, change the theory of the cause of action . . . and that issues not raised in the trial court cannot be raised for the first time on appeal"].)

## DISPOSITION

Judgment is affirmed. Defendant is entitled to recover costs on appeal.

13

_____
                                  Petrou, J.

WE CONCUR:


_____
Fujisaki, Acting P.J.


_____
Jackson, J.


*A158035/California Advocates for Nursing Home Reform v. Smith*

| | |
|---|---|
| Trial Court: | Alameda County Superior Court |
| Trial Judge: | Hon. Jo-Lynne Lee |
| Counsel: | Balisok & Associates, Russell S. Balisok; Law Office of Silvio Nardoni, Silvio Nardoni, for Plaintiffs and Appellants. |
| | Office of Attorney General, Xavier Becerra, Attorney General, Cheryl L. Feiner, Senior Assistant Attorney General, Gregory D. Brown, Supervising Deputy Attorney General, Dane C. Barca, Deputy Attorney General, for Defendant and Respondent. |