# IN THE SUPREME COURT OF CALIFORNIA

MAKE UC A GOOD NEIGHBOR et al.,
Plaintiffs and Appellants,

v.

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,
Defendants and Respondents;
RESOURCES FOR COMMUNITY DEVELOPMENT,
Real Party in Interest.

S279242

First Appellate District, Division Five
A165451

Alameda County Superior Court
RG21110142

June 6, 2024

Chief Justice Guerrero authored the opinion of the Court, in which Justices Corrigan, Liu, Kruger, Groban, Jenkins, and Evans concurred.

MAKE UC A GOOD NEIGHBOR v. THE REGENTS OF THE
UNIVERSITY OF CALIFORNIA

S279242

Opinion of the Court by Guerrero, C. J.

The University of California, Berkeley (UC Berkeley)
provides student housing to the lowest percentage of students at
any University of California campus in the state. In response to
concerns regarding housing insecurity, and in light of the Bay
Area's regional housing crisis, UC Berkeley proposes to build a
housing project on a site called People's Park near the campus.
The project has generated opposition. Project opponents
challenge the certification of an environmental impact report
(EIR) that evaluates both the specific housing project at People's
Park and a broader plan to guide long-term physical
development at UC Berkeley.[1] Plaintiffs Make UC a Good
Neighbor and People's Park Historic District Advocacy Group
(collectively, Good Neighbor) contend the EIR fails to consider
the environmental impacts caused by "student-generated noise"
such as "vocal noise from house parties and from late-night
pedestrians." They further contend the EIR failed to adequately
consider alternatives to the People's Park location. The Court
of Appeal agreed with Good Neighbor on these points.

_____

[1] The EIR was prepared pursuant to the California
Environmental Quality Act (CEQA) (Pub. Resources Code,
§ 21000 et seq.). All subsequent statutory references are to the
Public Resources Code unless otherwise indicated.

1

We granted review of the Court of Appeal's decision that the EIR was faulty because it: (1) "failed to assess potential noise impacts from loud student parties in residential neighborhoods near the campus," and (2) "failed to justify the decision not to consider alternative locations to the People's Park project." (*Make UC A Good Neighbor v. Regents of University of California* (2023) 88 Cal.App.5th 656, 665 (*Make UC*).)

After we granted review, on September 7, 2023, the Legislature passed Assembly Bill No. 1307 (2023–2024 Reg. Sess.) (Assembly Bill 1307) as urgency legislation, effective immediately. Assembly Bill 1307 added sections 21085 and 21085.2 to the Public Resources Code. As summarized by the Legislative Counsel, the new law provides that: (1) "the effects of noise generated by project occupants and their guests on human beings is not a significant effect on the environment for residential projects for purposes of CEQA"; and (2) "institutions of public higher education, in an EIR for a residential or mixed-use housing project, are not required to consider alternatives to the location of the proposed project if certain requirements are met." (Legis. Counsel's Dig., Assem. Bill No. 1307 (2023–2024 Reg. Sess.).)

The new law has narrowed the scope of the issues necessary for this Court to resolve. Good Neighbor concedes that Assembly Bill 1307 applies to our consideration of the case. Good Neighbor further concedes that the new law makes clear that the EIR, insofar as it evaluates the People's Park housing

project, is not required to examine "social noise"[2] or potential alternative locations to People's Park. However, Good Neighbor contends that its social noise claim as to the adequacy of the EIR's evaluation of the plan to guide long-term physical development remains viable because the new law "exempts only 'residential projects' from CEQA analysis," and Good Neighbor maintains that the development plan — including its asserted projected enrollment-driven population increase — "is not a 'residential project'" within the meaning of the new law. As to its alternative locations argument, Good Neighbor asks us to consider its claim with respect to housing projects that the Regents of the University of California (Regents) might carry out in the future pursuant to the development plan.

We conclude that, based on the new law, none of Good Neighbor's claims has merit and we accordingly reverse the Court of Appeal's judgment. We hold that the new law applies to both the People's Park housing project and the development plan, and the EIR is not inadequate for having failed to study the potential noisiness of future students at UC Berkeley in connection with this project. We decline to consider Good Neighbor's alternative locations argument with respect to potential future housing projects which are simply not before us. In short, as all parties have effectively acknowledged, this lawsuit poses no obstacle to the development of the People's Park housing project.

---

[2] We understand Good Neighbor to use the term "social noise" to refer to noise generated by human voices during social interactions, and we use the term in that fashion throughout this opinion.

**I.**

**A.**

Each University of California campus periodically develops a planning document referred to as a Long Range Development Plan (LRDP) to guide "physical development, including land use designations, the location of buildings, and infrastructure systems, for an established time horizon." (Ed. Code, § 67504, subd. (a)(1).) In July 2021, the Regents approved the LRDP at issue in this case (2021 LRDP). The 2021 LRDP identifies UC Berkeley's campus space, housing, and parking needs; and it describes the land use, open space, mobility, and infrastructure systems needed to support campus development.

The 2021 LRDP estimates future population levels at the university for planning purposes, but it "do[es] not mandate or commit UC Berkeley to any specific level of student enrollment or overall growth." For the horizon year of 2036–2037, the 2021 LRDP estimates a total campus population of 67,200. This estimate represents an increase of 12,070 individuals over the "current population" of 55,130 for the 2018–2019 year, including increases of 8,490 students and 3,580 faculty and staff.

One of the 2021 LRDP's goals is to "[i]mprove the existing housing stock and construct new student beds and faculty housing units in support of the Chancellor's Housing Initiative."[3] To that end, the 2021 LRDP plans for the addition

---

[3] The 2021 LRDP explains that the Chancellor's Housing Initiative establishes a goal of providing "two years of housing for entering freshmen; one year for entering transfer students; one year for entering graduate students; and up to [six] years for untenured faculty."

of 11,730 new student beds to be "implemented incrementally over the long term as resources become available for individual capital projects."[4]

In September 2021, the Regents approved a plan for the specific redevelopment project at issue here — Housing Project No. 2 — which sought to redevelop a site near the UC Berkeley campus known as People's Park.[5] The proposed project includes three primary components: (1) student housing; (2) preservation and revitalization of green space open to the public; and (3) affordable and permanent supportive housing to be developed by a nonprofit partner.[6] When complete, Housing Project No. 2 is projected to add 1,113 student beds, 1.7 acres of open landscape, and 125 affordable and supportive housing beds (housing for lower-income or formerly homeless individuals not affiliated with the university).

In the summer of 2021, the Regents certified an EIR (the 2021 EIR) that included both a "program" EIR (CEQA Guidelines, § 15168)[7] designed to identify and assess potential

---

[4]    By way of comparison, the 2021 LRDP notes that UC Berkeley had constructed approximately 1,100 beds of student housing under the prior LRDP, which was adopted in 2005.

[5]    Because the record contains references to both Housing Project No. 2 and the People's Park project, we use the terms interchangeably.

[6]    Real party in interest, Resources for Community Development (RCD), is the nonprofit partner.

[7]    All references to "CEQA Guidelines" are to the administrative guidelines for the implementation of CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.)  A "program" EIR allows an agency to "first analyze[] 'general matters contained

environmental impacts from the approval and implementation of the 2021 LRDP,[8] and a "project" EIR (CEQA Guidelines, § 15161)[9] designed to evaluate the implementation of two specific development projects, one of which is Housing Project No. 2.

## B.

In October 2021, Good Neighbor filed the operative petition for writ of mandate against the Regents, the president of UC Berkeley, and the Chancellor of UC Berkeley (collectively, respondents); it named RCD as a real party in interest. Good Neighbor alleged that the 2021 EIR "fails to lawfully assess or mitigate the Project's[10] effects on noise pollution," and "[f]ails to analyze a range of reasonable alternatives." The writ petition asked the trial court to void the approvals of the 2021 LRDP and

in a broader [initial] EIR . . . with later EIRs . . . [analyzing] narrow projects.' " (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 960.)

[8] Section 21080.09, subdivision (b) provides in relevant part, "[T]he approval of a long-range development plan [is] subject to this division and require[s] the preparation of an environmental impact report." The statute's reference to "this division" refers to CEQA. (§ 21080.09, subd. (b); see § 21050 ["This division shall be known and may be cited as the California Environmental Quality Act"].)

[9] A "project" EIR focuses "primarily on the changes in the environment that would result from the development project," and "examine[s] all phases of the project including planning, construction, and operation." (CEQA Guidelines, § 15161.)

[10] The writ petition uses the term "Project" to include the 2021 LRDP and Housing Project No. 2.

Housing Project No. 2 and to void the certification of the 2021 EIR.

In a supporting brief, Good Neighbor argued the 2021 EIR's analysis of social noise was inadequate because it failed to adequately study "student party and pedestrian noise disturbances." Good Neighbor cited a report from a noise expert who opined both that "vocal noise from house parties and from late-night pedestrians will exceed the residential Exterior Noise Limits adopted by the [2021] EIR as a threshold of significance,"[11] and that "there is no effective physical or regulatory mitigation to avoid these increased incidences of significant impacts from late night drunken pedestrians or unruly student parties." Good Neighbor noted that the noise expert relied on a history of noise complaints and failed abatement efforts documented in a letter by a leader of a program funded by UC Berkeley called Happy Neighbors. Good Neighbor also argued that the 2021 EIR was deficient for failing to study alternative locations for Housing Project No. 2.

In opposition to Good Neighbor's social noise claim, respondents and RCD argued that Good Neighbor failed to cite any legal authority for the proposition that the Regents were required to study such impacts, and they maintained that no such authority existed. They further contended that Good Neighbor's "argument assumes, without evidence, that

_____

[11] "A threshold of significance is an identifiable quantitative, qualitative or performance level of a particular environmental effect, noncompliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant." (CEQA Guidelines, § 15064.7, subd. (a).)

additional students would generate substantial late night noise impacts simply because they are students," and that Good Neighbor's supporting letters from the noise expert and the leader of the Happy Neighbors organization were "based upon speculation" rather than substantial evidence. Respondents and RCD also argued that they were not required to analyze infeasible off-site project location alternatives to Housing Project No. 2.

The trial court denied the petition. With respect to Good Neighbor's social noise claim, the court found that comment letters from the noise expert and the leader of Happy Neighbors were unpersuasive because they were "based upon speculation." As to the Regents' alleged failure to consider alternatives to Housing Project No. 2, the court determined that the Regents' "determination to not consider off-site alternatives [was] not a violation of CEQA as off-site development would not satisfy most of the project objectives, nor avoid or substantially lessen the significant effects of the People's Park project."

The *Make UC* court reversed the trial court's judgment and remanded the matter with directions that the trial court vacate its order and judgment denying Good Neighbor's petition for writ of mandate. (*Make UC*, *supra*, 88 Cal.App.5th at p. 695.) The Court of Appeal further directed that the trial court enter a modified judgment consistent with the appellate court's conclusions that the 2021 EIR was inadequate because it failed to study social noise impacts and because it failed to consider potential alternatives to Housing Project No. 2. (*Ibid.*)

With respect to noise impacts, the *Make UC* court agreed with Good Neighbor that, as to both the 2021 LRDP and Housing Project No. 2, "the EIR failed to analyze potential noise

impacts from loud student parties in residential areas near the campus." (*Make UC, supra,* 88 Cal.App.5th at p. 685.) After noting that "CEQA includes 'noise' as part of the ' "[e]nvironment" ' " (*ibid.,* quoting §§ 21060.5, 21068), and observing that "[t]he Legislature has declared that it is the state's policy to '[t]ake all action necessary to provide the people of this state with . . . freedom from excessive noise' " (*Make UC,* at p. 685, quoting § 21001, subd. (b)), the *Make UC* court explained that "CEQA applies to the type of noise at issue here — crowds of people talking, laughing, shouting, and playing music that disturbs neighboring residents" (*Make UC,* at p. 685).

The *Make UC* court rejected arguments that Good Neighbor's noise impact claim was based on "opinions and speculation that reflect an antistudent bias" and "stereotypes," and determined that, "[g]iven the long track record of loud student parties that violate the city's noise ordinances (the threshold for significance), there is a reasonable possibility that adding thousands more students to these same residential neighborhoods would make the problem worse." (*Make UC, supra,* 88 Cal.App.5th at pp. 687, 688, 689.) Thus, the *Make UC* court concluded, "The Regents must analyze the potential noise impacts relating to loud student parties." (*Id.* at p. 690.)

The *Make UC* court also concluded that the 2021 EIR "failed to consider and analyze a reasonable range of alternatives" to Housing Project No. 2. (*Make UC, supra,* 88 Cal.App.5th at p. 677.) While the *Make UC* court explained that it did "not hold the Regents must necessarily study an alternative site or sites for the People's Park project," the court concluded that "absent a viable explanation for declining to

consider alternative locations, the range of alternatives in the [2021] EIR was unreasonable." (*Id*. at pp. 676, 683.)

## C.

Respondents and Good Neighbor petitioned this Court to review different aspects of the Court of Appeal's decision.

We denied Good Neighbor's petition for review, asking whether CEQA "permit[s] the EIR to omit analysis of a lower enrollment and population growth alternative." Good Neighbor argued that the *Make UC* court erred in concluding "that the LRDP's campus enrollment and population plan is not part of the LRDP 'project,'" and contended that UC Berkeley was required to "mitigate significant off-campus impacts related to campus growth and development."

We granted respondents' petition for review to consider the *Make UC* court's determinations that the 2021 EIR improperly failed to analyze the environmental impact of social noise from students and failed to properly consider alternative locations for Housing Project No. 2. While the appeal was pending in this court, the Legislature passed a new law that impacts our review of these issues — Assembly Bill 1307, which added two new sections to the Public Resources Code that are discussed below.

## II.

## A.

"'CEQA embodies a central state policy to require state and local governmental entities to perform their duties "so that major consideration is given to preventing environmental damage." [Citations.] [¶] CEQA prescribes how governmental decisions will be made when public entities, including the state

itself, are charged with approving, funding — or themselves undertaking — a project with significant effects on the environment.' " (*County of Butte v. Department of Water Resources* (2022) 13 Cal.5th 612, 626.) "If, after performing an initial study, the agency responsible for CEQA compliance . . . finds substantial evidence that a project may have a significant environmental impact, the agency must prepare and certify an EIR before approving or proceeding with the project." (*Id.* at p. 627.)

However, "no matter how important its original purpose, CEQA remains a legislative act, subject to legislative limitation and legislative amendment." (*Napa Valley Wine Train, Inc. v. Public Utilities Com.* (1990) 50 Cal.3d 370, 376.) The Legislature may, for example, determine that a particular aspect of a project shall not constitute a "significant effect on the environment." (§ 21085; see, e.g., §§ 21081.3, subd. (a) [specifying that certain "aesthetic effects shall not be considered significant effects on the environment"], 21099, subds. (b)(2) [specifying that under certain circumstances "automobile delay, as described solely by level of service or similar measures of vehicular capacity or traffic congestion, shall not be considered a significant impact on the environment"], (d)(1) [specifying that "[a]esthetic and parking impacts of a residential, mixed-use residential, or employment center project on an infill site within a transit priority area shall not be considered significant impacts on the environment"].)

This case requires us to consider the meaning of the Legislature's limitation as to the applicability of CEQA contained in sections 21085 and 21085.2. Section 21085 provides: "For purposes of [CEQA], for residential projects, the

effects of noise generated by project occupants and their guests on human beings is not a significant effect on the environment." Section 21085.2, subdivision (b) provides: "Notwithstanding any other law or regulation, institutions of public higher education shall not be required, in an environmental impact report prepared for a residential or mixed-use housing project, to consider alternatives to the location of the residential or mixed-use housing project if both of the following requirements are met: [¶] (1) The residential or mixed-use housing project is located on a site that is no more than five acres and is substantially surrounded by qualified urban uses. [¶] (2) The residential or mixed-use housing project has already been evaluated in the environmental impact report for the most recent long-range development plan for the applicable campus."[12]

"Statutory interpretation is 'an issue of law, which we review de novo.'" (*Union of Medical Marijuana Patients, Inc. v.*

---

[12] Section 21085.2, subdivision (a) provides: "For purposes of this section, the following definitions apply: [¶] (1) 'Long-range development plan' means a physical development and land use plan to meet the academic and institutional objectives for a particular campus or medical center of public higher education. [¶] (2) 'Public higher education' means the institutions described in subdivision (a) of Section 66010 of the Education Code. [¶] (3) 'Residential or mixed-use housing project' means a project consisting of residential uses only or a mix of residential and nonresidential uses, with at least two-thirds of the square footage of the development designated for residential uses. [¶] (4) 'Substantially surrounded' means at least 75 percent of the perimeter of the project site adjoins, or is separated only by an improved public right-of-way from, parcels that are developed with qualified urban uses."

*City of San Diego* (2019) 7 Cal.5th 1171, 1183 (*Union of Medical Marijuana Patients*).) "Our overriding purpose in construing a provision of CEQA, as with any statute, is 'to adopt the construction that best gives effect to the Legislature's intended purpose.' [Citation.] In determining that intended purpose, we follow '[s]ettled principles.' [Citation.] 'We consider first the words of a statute, as the most reliable indicator of legislative intent.' [Citation.] In doing so, we give the words 'their usual and ordinary meaning,' viewed in the context of the statute as a whole. [Citation.] As part of this process, ' " '[every] statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect.' " ' " (*Id.* at pp. 1183–1184.)

"When the language of a statute is ambiguous — that is, when the words of the statute are susceptible to more than one reasonable meaning, given their usual and ordinary meaning and considered in the context of the statute as a whole — we consult other indicia of the Legislature's intent, including such extrinsic aids as legislative history and public policy. [Citations.] If there is no ambiguity, ' " ' "we presume the Legislature meant what it said and the plain meaning of the statute governs." ' " ' " (*Union of Medical Marijuana Patients*, *supra*, 7 Cal.5th at p. 1184.)

"In addition to these general precepts, a more specific principle is directly applicable when . . . the Legislature undertakes to amend a statute which has been the subject of judicial construction. In such a case it is presumed that the Legislature was fully cognizant of such construction, and when substantial changes are made in the statutory language it is usually inferred that the lawmakers intended to alter the law in

those particulars affected by such changes." (*Palos Verdes Faculty Assn. v. Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 659 (*Palos Verdes*).)

In mandamus proceedings, a reviewing court applies the law that is current at the time of judgment in the reviewing court. (*Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 626 (*Citizens for Positive Growth*); see *Callie v. Board of Supervisors* (1969) 1 Cal.App.3d 13, 19 [applying this principle with respect to injunction proceedings because " '[r]elief by injunction operates in futuro' " and observing that "[t]he same equitable considerations also have been applied in the case of mandamus proceedings"].)

## B.

Good Neighbor concedes that Assembly Bill 1307 resolves significant aspects of its claims — both with respect to the 2021 EIR's analysis of social noise impacts and its consideration of alternative locations to Housing Project No. 2.

With respect to social noise impacts, Good Neighbor concedes that section 21085 "prevents [a] court from requiring project-level CEQA analysis of the effects of 'social noise' associated with Housing Project [No.] 2 as sited in People's Park."

Regarding the need to consider alternative locations, Good Neighbor concedes that Housing Project No. 2 "meets the criteria specified in new . . . section 21085.2 for exemption from further CEQA review" and that "[t]he housing exemption for institutions of public higher education . . . specifically intended to preclude judicial action requiring additional alternative sites CEQA review for Housing Project No. 2 as proposed in People's Park."

Nonetheless, Good Neighbor contends a portion of its claim regarding social noise impacts remains viable — namely, the portion relating to the 2021 LRDP, including the enrollment-driven population plan it asserts is encompassed within the 2021 LRDP. Good Neighbor further contends that, although its argument regarding the need to consider alternatives to Housing Project No. 2 is "moot," this Court should decide the claim because it raises issues of broad public interest that are likely to recur. We discuss these claims in turn.

**C.**

As an initial matter, we accept Good Neighbor's concession that section 21085 precludes "project-level CEQA analysis of the effects of 'social noise' associated with Housing Project [No.] 2 as sited in People's Park." Good Neighbor argued below that the EIR's analysis of the impacts of "student-generated noise" was inadequate. But section 21085 clearly states that "[f]or purposes of [CEQA], for residential projects, the effects of noise generated by project occupants and their guests on human beings is not a significant effect on the environment."

Because Good Neighbor does not dispute either that Housing Project No. 2 is a "residential project[]" within the meaning of section 21085, or that this statute governs our consideration of the merits of the social noise claim on appeal (*Citizens for Positive Growth*, *supra*, 43 Cal.App.5th at p. 626), Good Neighbor's social noise claim with respect to Housing Project No. 2 necessarily fails. It cannot be said that the 2021 EIR is inadequate for having failed to study the effects of social noise associated with Housing Project No. 2, when no such analysis is required under section 21085. The alleged environmental impacts of "noise generated by project occupants

and their guests on human beings" at the proposed new housing project located at People's Park are not subject to review under CEQA. (§ 21085.)

What remains for us to decide is Good Neighbor's claim that the 2021 EIR is nonetheless deficient for failing to adequately consider the environmental impacts of social noise resulting more broadly from the 2021 LRDP — the long-range plan that governs physical development at UC Berkeley through the horizon year of 2036–2037.[13]

According to Good Neighbor, one reason this claim remains viable is because the 2021 LRDP does not constitute a "residential project[]" within the meaning of section 21085. Although the term "residential projects" is not defined for purposes of section 21085, section 21065 defines a " '[p]roject' " as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment," when carried out directly or indirectly by a public agency under specified circumstances. Given that section 21060 mandates that section 21065's definition of project shall "govern the construction" of CEQA (§ 21060), "we must assume that in using the defined term 'project' in section [21085], the Legislature intended it to bear

_____

[13]  Aside from its *social* noise claim, Good Neighbor does not contend that the 2021 EIR was deficient in any other aspect of its environmental analysis of noise, either with respect to Housing Project No. 2 or the LRDP. We note that both the draft and final version of the 2021 EIR contain a detailed analysis of anticipated noise, including that generated by construction and traffic with respect to both Housing Project No. 2 and the LRDP. Public comments were also received, considered, and responded to during the environmental analysis of these noise impacts.

the definition assigned in section 21065." (*Union of Medical Marijuana Patients*, *supra*, 7 Cal.5th at p. 1191; see *ibid.* [Legislature's "use of the defined term 'project,' rather than a generic term such as 'activity,' suggests that the Legislature intended to incorporate the defined concept"].)[14]

Unlike the term "project," the term "residential" is not statutorily defined within CEQA. We therefore presume that

---

[14] We have explained that section 21060 makes certain statutory definitions provided in CEQA binding on courts: " ' "If the Legislature has provided an express definition of a term, that definition ordinarily is binding on the courts." ' [Citation.] As a corollary of this principle, '[t]erms defined by the statute in which they are found will be presumed to have been used in the sense of the definition.' [Citation.] In the case of CEQA, this judicial presumption is legislatively mandated. Section 21060 expressly states that CEQA's definitions 'govern the construction of this division.' " (*Union of Medical Marijuana Patients*, *supra*, 7 Cal.5th at p. 1191.)

By contrast, while Good Neighbor notes that the Legislature provided a definition for " '[r]esidential or mixed-use housing project' " in section 21085.2 governing the consideration of certain alternatives (*id.*, subd. (a)(3)), the Legislature specified that this definition applies only "[f]or purposes of this section" — that is, section 21085.2. (*Id.*, subd. (a).) Under these circumstances, we decline to apply section 21085.2's definition of " '[r]esidential or mixed-use housing project' " to section 21085's use of the term "residential projects." (See, e.g., *Skidgel v. California Unemployment Ins. Appeals Bd.* (2021) 12 Cal.5th 1, 23 [declining to apply statutory definition from one section of a statutory scheme to another section where "[n]othing suggests . . . the Legislature intended or understood that it would" apply in such a fashion].) As we recognized in *People v. Leal* (2004) 33 Cal.4th 999, 1007, a statutory definition that "begins with the phrase, '[a]s used in this section,' . . . belies any legislative intent to apply the definition[]" outside of the specified section.

the Legislature intended for it to have its "ordinary meaning." (*In re N.R.* (2023) 15 Cal.5th 520, 539 ["The Legislature's failure to define [a term] suggests that legislators intended for this term to bear its ordinary meaning in this context"].)  And we take the ordinary meaning of "residential" to mean "of or relating to residence or residences."  (Merriam-Webster Dict. Online (2024) <https://www.merriam-webster.com/dictionary/Residential> [as of June 6, 2024];[15] see *In re N.R.*, at p. 540 [dictionary definitions may be helpful in ascertaining the ordinary meaning of words].)  Thus, considering the individual terms "residential" and "projects" together, the Legislature's use of the collective term "residential projects" in section 21085 suggests that the statute applies to public agency activities that relate to residence or residences that may have a significant effect on the environment.

Contrary to Good Neighbor's assertion that the meaning of the term "residential projects" in section 21085 is plain, we conclude that, even when applying the above construction, the term may have different meanings.  As used in the statute, the term might narrowly refer to plans to add residential units to a specific location.  (See, e.g., *City of Goleta v. Superior Court* (2006) 40 Cal.4th 270, 274 [developer "submitted a vesting tentative subdivision map to the County for a multiunit residential project within [City's] proposed boundaries"].)  Or the term might more broadly refer to land use planning to the extent it concerns residential development.  (See, e.g., CEQA

---

[15]    All internet citations in this opinion are archived by year, docket number and case name at <http://www.courts.ca.gov/38324.htm>.

Guidelines, § 15182, subd. (c)(1) ["Residential projects covered by this section include but are not limited to land subdivisions, zoning changes, and residential planned unit developments"].) Section 21085's brevity — consisting of a single sentence — provides limited contextual clues as to the breadth the Legislature intended to ascribe to the term.

Advancing a narrower interpretation, Good Neighbor argues that "[t]he Legislature could have amended CEQA to provide that *'for LRDPs*, noise generated *by LRDP population plans* is not a significant effect on the environment,' but it did not." (Italics added.) This argument is unpersuasive. That the Legislature could have specifically referred to LRDPs does not answer the question of whether an LRDP is within the scope of the different term — namely, "residential projects" (§ 21085) — which the Legislature chose to use. Good Neighbor's invocation of the canon of statutory construction, *expressio unius est exclusio alterius*, pursuant to which "the explicit mention of some things in a text may imply other matters not similarly addressed are excluded" (*Howard Jarvis Taxpayers Assn. v. Padilla* (2016) 62 Cal.4th 486, 514), does not advance its claim here because Good Neighbor has failed to establish that the 2021 LRDP is outside the scope of section 21085's reference to "residential projects."

A broader interpretation of "residential projects" (§ 21085) — one that encompasses land use planning to the extent it concerns residential development — appears to better correspond with the Legislature's intent to specify the type of noise that does not constitute a significant effect on the environment, namely that emanating from "project occupants and their guests." (§ 21085.) In addition, by referring to

"residential projects" rather than LRDPs in section 21085, the Legislature appears to have left open the possibility that certain noise impacts from a nonresidential project (e.g., a stadium, entertainment venue, or commercial center) planned for in an LRDP might constitute a significant effect on the environment.[16]

Ultimately, after considering the text and statutory context of the term "residential projects" in section 21085, we conclude the term is ambiguous. The statute's reference to "residential projects" could either refer narrowly to plans to add residential units to a specific location, or more broadly to land use planning to the extent it concerns residential development. We therefore consider " ' " ' "the statute's purpose, legislative history, and public policy" ' " ' " (*Smith v. LoanMe, Inc.* (2021) 11 Cal.5th 183, 190 (*Smith*)) to discern its meaning.

It is unnecessary for us to conclusively define the scope of the meaning of "residential projects" in section 21085. Even assuming the 2021 LRDP is not a plan to add residential units to a specific location,[17] the statute's purpose, as revealed in its legislative history, makes clear that the term should be interpreted broadly enough to encompass those portions of the 2021 LRDP at issue in this case. (See 2A Singer & Singer, Statutes and Statutory Construction (7th. ed. 2023) § 48:3

---

[16] We have no occasion to consider whether social noise impacts from nonresidential aspects of an LRDP might constitute a significant effect on the environment in the wake of the enactment of section 21085.

[17] However, the 2021 LRDP does include a map identifying specific sites for potential development, including the People's Park site on which Housing Project No. 2 is planned to be built.

["Courts look to a statute's contemporary history and historical background as aids to interpretation," to "illuminate the circumstances under which an act was passed, the mischief at which it was aimed, and the statute's 'object' or 'purpose' "], fns. omitted; see, e.g., *Delaney v. Baker* (1999) 20 Cal.4th 23, 41 [noting that the meaning of a statutory phrase may depend upon the legislative history and underlying purpose of the statute in which the phrase is used].)

The legislative history of Assembly Bill 1307 overwhelmingly establishes that the Legislature enacted the new law to abrogate the *Make UC* decision. This critical fact guides our interpretation of the term "residential projects" in section 21085. The legislative history is replete with references to the *Make UC* decision.[18] And it is quite clear that, in enacting section 21085, the Legislature was focused on rejecting the *Make UC* court's central underlying conclusion that social noise from residential users may constitute a significant effect on the environment. (Compare *Make UC, supra,* 88 Cal.App.5th at p. 685 ["CEQA applies to the type of noise at issue here — crowds of people talking, laughing, shouting, and playing music that disturbs neighboring residents"] with Sen. Com. on

---

[18] See, e.g., Assembly Committee on Natural Resources, Report on Assembly Bill No. 1307 (2023–2024 Reg. Sess.) as amended March 16, 2023, page 2; Assembly Committee on Appropriations, Report on Assembly Bill No. 1307 (2023–2024 Reg. Sess.) as amended March 16, 2023, page 2; Senate Committee on Environmental Quality, Analysis of Assembly Bill No. 1307 (2023–2024 Reg. Sess.) as amended May 18, 2023, pages 2–3; Senate Rules Committee, Office of Senate Floor Analyses, Analysis of Assembly Bill No. 1307 (2023–2024 Reg. Sess.) as amended June 26, 2023, pages 5, 7, 9.

Environmental Quality, Analysis of Assem. Bill No. 1307, *supra*, p. 1 [broadly stating that the bill "specifies that noise from residents does not constitute a significant environmental effect under the California Environmental Quality Act"].)    For example, Assembly Bill 1307's author explained that one purpose of the bill was to "remove the potential for litigants to challenge residential development based on the speculation that the new residents will create unwanted noises," concluding instead "that minor and intermittent noise nuisances, such as from unamplified human voices, be addressed through local nuisance ordinances and not via CEQA."    (Sen. Com. on Environmental Quality, Analysis of Assem. Bill No. 1307, *supra*, p. 3.)[19]

---

[19]    Good Neighbor argues that this statement, which is repeated throughout several committee reports as the bill author's statement, "is not relevant to, much less dispositive of, the Court's construction of new CEQA section 21085, because 'statements of an individual legislator, including the author of a bill, are generally not considered in construing a statute, as the court's task is to ascertain the intent of the Legislature as a whole in adopting a piece of legislation.' " (Quoting *Quintano v. Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1062.)    The contention is without merit.    "Where, as here, the author's statements are part of committee materials — and are therefore relayed not merely as personal views, but instead as part of the Legislature's consideration of the bill — they can serve as salient reflections of legislative purpose." (*McHugh v. Protective Life Ins. Co.* (2021) 12 Cal.5th 213, 241.)    In interpreting legislation, this court has frequently relied on a statement of the bill's author when such statement is contained in committee materials.  (See, e.g., *People v. Braden* (2023) 14 Cal.5th 791, 820; *Smith*, *supra*, 11 Cal.5th at p. 197.)

The Legislature's intent to provide that social noise does not constitute a significant impact on the environment for residential projects is directly contrary to the *Make UC* court's conclusion that the 2021 EIR was inadequate for having failed to study such noise impacts. (See, e.g., Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Assem. Bill No. 1307, *supra*, p. 7 [stating that the *Make UC* court established a "new precedent that noise from residents in projects should be an environmental factor considered under CEQA," but rejecting such reasoning because "CEQA does not need to be expanded to include noises from residents (or residents suspected of being inherently noisy), as there are already mechanisms in place to get noisy neighbors to quiet down"].) Indeed, the Legislature described as "alarming" the *Make UC* court's reasoning that social noise should be considered because "*students* are noisy and more likely to party than other people." (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Assem. Bill No. 1307, *supra*, p. 7.)

This clear legislative intent to abrogate the *Make UC* court's interpretation of CEQA as mandating a consideration of social noise in this manner strongly supports the conclusion that the Legislature intended for section 21085 to apply to the 2021 EIR's evaluation of the residential aspects of the 2021 LRDP. (See *Palos Verdes*, *supra*, 21 Cal.3d at p. 659 [stating that when the Legislature substantially amends a statute that has previously been judicially construed, it is usually inferred that the Legislature intended to change the law].)

Good Neighbor advances a different interpretation — one that applies section 21085 solely to the 2021 EIR's evaluation of Housing Project No. 2, but not to any portion of the 2021 EIR's

evaluation of the 2021 LRDP.  But we find nothing in the legislative history of Assembly Bill 1307 suggesting the Legislature intended to limit application of section 21085 in this manner.  (See *Winn v. Pioneer Medical Group, Inc.* (2016) 63 Cal.4th 148, 163 [" 'the *absence* of legislative history [can] be of significance in deciphering legislative intent' "]; *In re N.R.*, *supra*, 15 Cal.5th at p. 546 [same].)  The absence of such legislative history is particularly instructive because the Legislature was aware that the 2021 EIR evaluated *both* the 2021 LRDP and Housing Project No. 2, and that both were at issue in *Make UC*.  (See Sen. Com. on Housing, Analysis of Assem. Bill No. 1307 (2023–2024 Reg. Sess.) as amended June 26, 2023, p. 5 [describing *Make UC* and noting that "UC Berkeley analyzed the [2021] LRDP and the People's Park project together in a single EIR"].)

We further conclude it would have been reasonable for the Legislature to have considered the 2021 LRDP to be a "residential project[]" (§ 21085), at least with respect to that portion of the 2021 LRDP challenged in this case.  The 2021 EIR, the *Make UC* court, and the legislative history of Assembly Bill 1307 all described the 2021 LRDP in a way that logically correlates with the meaning of a residential project.

Specifically, the 2021 EIR described the 2021 LRDP by noting that its "proposed development program includes . . . approximately 11,073 student beds and 549 faculty and staff beds," and that it plans for a campus population of "48,200 students and 19,000 faculty and staff in the . . . 2036–37 academic year."

Similarly, the *Make UC* court described the 2021 LRDP as follows:  "The 2021 plan encompasses a general strategy for

meeting the housing goals identified in the chancellor's initiative. The university anticipates (but is not committed to) constructing up to 11,731 net new beds to accommodate a projected increase in the campus population (students, faculty, and staff) of up to 13,902 new residents. In addition, the plan projects that another 8,173 students, faculty and staff will be added to the population by the 2036–2037 academic year who will not be provided with university housing." (*Make UC, supra,* 88 Cal.App.5th at p. 666.)

The legislative history of Assembly Bill 1307 also indicates that the Legislature was aware of the residential aspect of the 2021 LRDP. One committee analysis described the 2021 LRDP as follows: "Each UC is required to adopt an LRDP, which is a high level planning document that helps guide decision[s] on land and infrastructure developments. An LRDP . . . functions as a combination programmatic EIR and general land use plan. UC Berkeley provides housing for only 23% of its students, which is by far the lowest of any UC. Enrollments have outpaced student housing development. The prior LRDP, adopted in 2005, called for the construction of 2,600 beds through 2021, which was 10,000 beds short of the projected enrollment increase. The university only produced 1,119 of those bed[s], while simultaneously increasing enrollment beyond what was planned for in the LRDP. The most recent LRDP, adopted in 2021, proposes to build 11,731 beds." (Sen. Com. on Housing, Analysis of Assem. Bill No. 1307, *supra,* pp. 4–5.)

All these descriptions of the 2021 LRDP as a document designed to plan for an increase in the number of housing units and residents to the UC Berkeley campus area support the

conclusion that the Legislature intended the term "residential projects" to apply to those portions of the 2021 LRDP at issue here.

Public policy considerations lead to the same conclusion. We need not wade into the contentious public debate surrounding the implementation of Housing Project No. 2 and the 2021 LRDP. Nonetheless, as was true with the *Make UC* court, "[w]e are, of course, aware of the public interest in this case . . . and the broader public debate about legal obstacles to housing construction." (*Make UC*, *supra*, 88 Cal.App.5th at p. 665.) Given this context, we find it untenable that the Legislature would preclude the consideration of social noise impacts under CEQA only for projects designed to add residential units to a specific location (such as Housing Project No. 2) while potentially requiring the same analysis of social noise when an agency makes broader land use planning decisions (such as the 2021 LRDP) that encompass the specific projects. If anything, an agency's broader land use planning decisions have less direct connection to the production of social noise than an agency's specific project adding residential units to a specific location. We see nothing in section 21085's purpose, legislative history, or public policy that would support such an anomalous result by limiting the statute's application to Housing Project No. 2 only.

Good Neighbor also focuses on the social noise impacts it contends are "caused by all of the students included in the LRDP's projected enrollment-driven population increase," in its supplemental answer brief. Good Neighbor reasons that the enrollment-driven population increase — which forms a part of the LRDP at issue and which will bring thousands of new

students to the campus — is not a residential project and thus must be evaluated for social noise impacts whether such students are housed in UC Berkeley residential projects or not.

This argument is at odds with the Court of Appeal's holding regarding the limited purpose and scope of the LRDP. The *Make UC* court held that these enrollment-driven population increases were not part of the 2021 LRDP, and therefore the 2021 EIR was not deficient for "failing to analyze an alternative to the development plan that would limit student enrollment." (*Make UC*, *supra*, 88 Cal.App.5th at p. 668; see *id.* at pp. 672–675.) It reasoned that "the process for setting enrollment levels in the UC system is complicated, with multiple players, interests, and trade-offs," and that the LRDP "deliberately keeps separate the complex annual process for setting student enrollment levels." (*Id.* at pp. 671, 672.) As the *Make UC* court further explained, "the Regents adopted a program EIR for a limited, high-level land use plan and made a reasoned decision to exclude the enrollment process from the scope of the project." (*Id.* at p. 673.) We denied Good Neighbor's petition seeking review of the *Make UC* court's conclusion that the 2021 LRDP is not an enrollment-driven population plan, and so Good Neighbor's arguments focused on this issue are not before us.

Further, the Legislature could have reasonably determined that there was no need to specify in section 21085 that CEQA does not require an agency to study social noise related to an increase in campus population recounted in an LRDP because, as the *Make UC* court also noted, in a recent amendment to the statute, "the Legislature exempted enrollment and enrollment increases from the definition of a

project under CEQA." (*Make UC, supra*, 88 Cal.App.5th at p. 676, citing Sen. Bill No. 118 (2021–2022 Reg. Sess.), Stats. 2022, ch. 10, § 1, eff. Mar. 14, 2022; § 21080.09, subd. (d).)

Finally, we reject as unsound Good Neighbor's argument that the new legislation "implicitly affirms . . . the [*Make UC* court's] ruling" by failing to specify the statute's potential application to the 2021 LRDP. (Italics omitted.) Drawing such a negative inference is unwarranted given that the portions of the 2021 LRDP at issue in this case are reasonably characterized as a "residential project[]" (§ 21085). And such an inference would stand in stark tension with the legislative history discussed above that found the *Make UC* court's holding regarding the environmental impacts of social noise from students and their guests to be "alarming." (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Assem. Bill No. 1307, *supra*, p. 7.)

In sum, given the Legislature's enactment of section 21085, we conclude the 2021 EIR was not inadequate for failing to have considered whether the impacts of social noise on neighboring residents potentially caused by future students at UC Berkeley constituted a significant effect on the environment with respect to either Housing Project No. 2 or the residential aspects of the 2021 LRDP. The *Make UC* court's contrary holdings must be reversed in the wake of the enactment of Assembly Bill 1307.

### D.

The *Make UC* court concluded that the 2021 EIR was faulty for having "failed to justify the decision not to consider alternative locations to the People's Park project." (*Make UC, supra*, 88 Cal.App.5th at p. 665.)

As previously noted, Assembly Bill 1307 added new section 21085.2, which specifies that public universities "shall not be required, in an environmental impact report prepared for a residential or mixed-use housing project, to consider alternatives to the location of the residential or mixed-use housing project" when certain criteria are met. (§ 21085.2, subd. (b).) Good Neighbor concedes that Housing Project No. 2 meets section 21085.2's criteria. We accept Good Neighbor's concession. Further, because of section 21085.2's application to Housing Project No. 2, the Regents "shall not be required . . . to consider alternatives to the location of" (§ 21085.2, subd. (b)) the proposed new housing at People's Park, and the 2021 EIR is not inadequate for having failed to consider alternative locations for this project.

In deciding this issue, we reject Good Neighbor's framing of the question as one involving mootness. Specifically, Good Neighbor contends that section 21085.2 "moots" its alternative sites claim, but we should nonetheless "decide Good Neighbor's claim because . . . it raises issues of broad public interest that are likely to recur." According to Good Neighbor, we should consider how section 21085.2 might apply to future housing projects that the Regents might carry out pursuant to the 2021 LRDP and we "should not allow [the Regents] to evade review of this claim by obtaining passage of a statute that moots the claim."

The mootness doctrine has no application here. "A case becomes moot when events ' "render[] it impossible for [a] court, *if it should decide the case in favor of plaintiff*, to grant him any effect[ive] relief." ' " (*In re D.P.* (2023) 14 Cal.5th 266, 276, italics added.) That has not occurred here. Section 21085.2 does

not make it impossible for a court to provide Good Neighbor relief if it were to decide the case in Good Neighbor's favor. Instead, section 21085.2 makes clear that Good Neighbor is not entitled to relief. Stated differently, the recent legislation does not moot the case; it determines who prevails.

We further reject Good Neighbor's request that we consider the potential application of the new statute to *future projects* on the ground that it is not encompassed within the applicable issue raised in respondents' petition for review, which is whether the EIR "failed to justify the decision not to consider alternative locations to the *People's Park project*." (*Make UC*, *supra*, 88 Cal.App.5th at p. 665, italics added.) As noted, Good Neighbor concedes that the People's Park project "meets the criteria specified in new . . . section 21085.2 for exemption from further CEQA review." The question of how section 21085.2 might apply to future housing projects — other than the People's Park project — is simply not before us and we do not render advisory opinions on such issues.

## III.

We reverse the judgment of the Court of Appeal in favor of Good Neighbor and we remand the matter to the Court of Appeal with directions to remand the case to the trial court to enter a

judgment on the merits of Good Neighbor's writ petition in favor
of respondents.


**GUERRERO, C. J.**


**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Make UC A Good Neighbor v. Regents of University of California

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 88 Cal.App.5th 656
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S279242
**Date Filed:** June 6, 2024

_____

**Court:**  Superior
**County:**  Alameda
**Judge:**  Frank Roesch

_____

**Counsel:**

Law Offices of Thomas N. Lippe, Thomas N. Lippe; Soluri Meserve, Patrick M. Soluri, Osha R. Meserve and James C. Crowder for Plaintiffs and Appellants.

The Sohagi Law Group, Nicole H. Gordon, Margaret M. Sohagi, Mark J.G. Desrosiers; Lubin Olson & Niewiadomski, Charles R. Olson, Philip J. Sciranka; Charles F. Robinson, Rhonda S. Goldstein, Katharine S. Essick, Alison L. Krumbein; David M. Robinson; Horvitz & Levy, Beth J. Jay, Jeremy B. Rosen, Mitchell C. Tilner and H. Thomas Watson for Defendants and Respondents.

Farimah Faiz Brown, City Attorney, for the City of Berkeley as Amicus Curiae on behalf of Defendants and Respondents.

Holland & Knight and Jennifer L. Hernandez for The Two Hundred for Homeownership as Amicus Curiae on behalf of Defendants and Respondents.

Downey Brand, Kathryn Oehlschlager and Breana M. Inoshita for the League of California Cities and the California State Association of Counties as Amici Curiae on behalf of Defendants and Respondents.

Buchalter, Douglas C. Straus and Alicia Cristina Guerra for Real Party in Interest Resources for Community Development.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Thomas N. Lippe
Law Offices of Thomas N. Lippe, APC
50 California Street, Suite 1500
San Francisco, CA 94111
(415) 777-5604

Nicole H. Gordon
The Sohagi Law Group, PLC
11999 San Vicente Boulevard, Suite 150
Los Angeles, CA 90049
(310) 475-5700